The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

Victor Manuel **GARCIA**, Defendant–Appellant.

No. 86SA143.

Supreme Court of Colorado, En Banc.

March 14, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., David L. Saine, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Joseph Saint–Veltri, Denver, for defendant-appellant.

VOLLACK, Justice.

The appellant, Victor Manuel Garcia (Garcia or the defendant), appeals from his conviction of possession of cocaine as a special offender, for which he received an enhanced sentence of twenty years imprisonment. We find the defendant's claims of error to be without merit; therefore we affirm.[1]

---

1. Because the defendant is challenging the constitutionality of a statute, this court has jurisdiction pursuant to sections 13–4–102(1)(b) and 13–4–110(1)(a), 6A C.R.S. (1987).

## I.

In April 1983, the defendant and two co-defendants were charged in El Paso County District Court with possession of cocaine with intent to dispense pursuant to section 18–18–105(1)(a), (2)(a)(I), 8B C.R.S. (1986), a class 3 felony.[2] In September 1983, an amended information was filed, charging Garcia as a special offender under section 18–18–107(1)(d), 8B C.R.S. (1986).[3]

Garcia's two co-defendants, Helen Rodriguez and Stephenson Solar, entered into plea agreements with the prosecution and pled guilty to lesser offenses. A jury trial was held in December 1983 on the charges against Garcia. As part of Rodriguez' plea agreement, she testified as a prosecution witness at Garcia's trial. The jury found Garcia guilty of possession of cocaine with intent to dispense, and affirmatively answered the special interrogatory on the special offender charge. The defendant's Motion for New Trial was denied, and the trial court sentenced him to twenty years in the Department of Corrections plus one year of parole. The defendant appealed directly to this court, challenging the constitutionality of the special offender statute and raising numerous allegations of error throughout his trial and sentencing.

At Garcia's trial, Colorado Springs Police Officer Dennis Hougnon testified that he and several other officers had been assigned to watch the Knob Hill Body Shop on March 26, 1983, based on a confidential informant's tip that a drug transaction would be taking place at that location. The informant had advised an officer that an individual named Victor "Manny" Garcia, a man named "Steve," and an unidentified woman would be traveling in a vehicle with Florida license plates. The officer was told that "Manny" had traveled to Colorado Springs in order to sell two kilos of cocaine, and he was looking for a vehicle with Colorado license plates to drive while he was in the state. The informant indicated that the woman would be carrying the cocaine "to keep the heat away from Victor Garcia."

The officers were surveilling the body shop from unmarked police cars when they noticed a van with Florida license plates drive into the body shop's parking lot. Three individuals were in the van. A man later identified as Victor Manuel Garcia exited from the passenger side of the van, entered the body shop, then returned with

2. **18–18–105. Unlawful distribution, manufacturing, dispensing, sale, or possession.** (1)(a) Except as authorized by part 3 of article 22 of title 12, C.R.S., [the Colorado Controlled Substances Act] it is unlawful for any person knowingly or intentionally to manufacture, dispense, sell, or distribute, with or without remuneration, to possess, or to possess with intent to manufacture, dispense, sell, or distribute, with or without remuneration, a controlled substance; or to induce, attempt to induce, or conspire with one or more other persons to manufacture, dispense, sell, or distribute, with or without remuneration, or to possess with intent to manufacture, dispense, sell, or distribute, with or without remuneration, a controlled substance.
....

 (2) Except as is otherwise provided for offenses concerning marihuana and marihuana concentrate in section 18–18–106, any person who violates any of the provisions of subsection (1) of this section:
 (a) In the case of a controlled substance listed in schedule I or II of part 3 of article 22 of title 12, C.R.S., commits:
 (I) A class 3 felony; ...
8B C.R.S. (1986).

3. **18–18–107. Special offender.** (1) Upon a felony conviction for a violation of part 3 of article 22 of title 12, C.R.S., or upon a felony conviction under this article, the presence of any one or more of the following extraordinary aggravating circumstances designating the defendant a special offender shall require the court to sentence the defendant to a term greater than the presumptive range for a class 2 felony but not more than twice the maximum term for a class 2 felony authorized in the presumptive range for the punishment of such felony:
 ....
 (d) The defendant unlawfully introduced, distributed, or imported into the state of Colorado any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.); or, with the intent to promote or facilitate the introduction, distribution, or importation of any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.) into the state of Colorado, he aided, abetted, or advised another person to introduce, distribute, or import any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.) into the state of Colorado; ...
8B C.R.S. (1986).

the shop's owner, Kenny Reinke. Garcia and Reinke entered the van and it was driven into the body shop garage.

Shortly thereafter, Garcia and the two other people in the van, later identified as Stephenson Solar and Helen Rodriguez, left the body shop, climbed into Reinke's Jeep Wagoneer, and drove away. Officer Hougnon followed the Jeep to a Ramada Inn, where the three suspects entered a motel room registered to Rodriguez. Hougnon testified that throughout this surveillance, Rodriguez was carrying a blue duffle bag or backpack.

Some time later, Garcia and Solar left the motel room and drove away in the Jeep; neither was carrying the backpack. The two men returned twenty to thirty minutes later, at which point Rodriguez exited the motel and drove away alone in the Jeep, carrying the backpack. Hougnon and other officers followed, stopped the Jeep, and arrested Rodriguez. The backpack was found on the floorboard on the passenger side; it contained approximately four pounds of cocaine wrapped in two packages. After Rodriguez' arrest, another officer arrested Garcia on the second floor of the main area of the Ramada Inn. Solar was also apprehended in the motel room and placed under arrest.

Rodriguez, Solar, and Garcia were all originally charged with possession of cocaine. Rodriguez testified at trial that she accompanied her boyfriend (Solar) and the defendant on a trip from Florida to Colorado Springs in the van which the police had seen at the body shop. She testified that she did not realize until after they left Florida that the blue backpack which was part of their luggage held cocaine. During the trip from Florida, Garcia sometimes filled a rolled dollar bill with cocaine from the backpack and the three would sniff the cocaine. Rodriguez also testified that while they were in Colorado Springs, she made phone calls for Garcia attempting to locate an individual named Ricky. She explained that the reason she was carrying the backpack when she left the Ramada Inn to go to a restaurant was that Garcia

and Solar "were afraid of a rip-off of that person who was coming to see them."

The jury convicted the defendant, and he filed this appeal. Garcia contends that a number of errors occurred in his jury trial and sentencing, and challenges the constitutionality of the special offender statute.

## II.

### A.

The first claim of error raised by the defendant is that the twenty year sentence imposed on him by the trial court was an abuse of discretion. We disagree.

A trial judge has wide latitude in imposing a sentence, and "a sentence will not be modified unless there has been a clear abuse of discretion." *People v. Strong,* 190 Colo. 189, 191, 544 P.2d 966, 967 (1976). In *People v. Duran,* 188 Colo. 207, 533 P.2d 1116 (1975), we adopted the following approach:

> In fixing punishment, matters and things other than a defendant's guilt of the particular crime are to be considered. Appropriate, perhaps necessary, to the inquiry are the history, background, character and criminal activities of the defendant. Both aggravating and mitigating circumstances are relevant. Pertinent information is not generally to be disregarded because of exclusionary rules of evidence.

*Id.* at 214, 533 P.2d at 1119 (citing *United States v. Majors,* 490 F.2d 1321, 1322 (10th Cir.1974)).

At Garcia's sentencing hearing, the trial court made these factual findings:

> [T]here is something special besides the things I have talked about that apply when you are in a level of transaction, trafficking in cocaine that this Defendant was. I think it's obvious on its face, and that is to deal in these quantities [of cocaine], to move these quantities around the country, to set up a mechanism so they can be sold and distributed, there has to be some level of organization. There's a real risk to our society, our community in that organization in and of itself.

. . . .

We find within Mr. Garcia's past a felony conviction for a murder over a drug ripoff that had been planned.

. . . .

He wasn't the hands on murderer. He wasn't the one that actually did the killing. He certainly had some level of involvement, under legal principals [sic] was accountable for what those other people did.

... What we know about the Defendant's character would indicate that he's beyond rehabilitation, that at least the threat of substantial prison terms and involvement in the Court process doesn't slow him down at all; that, in fact, he's quite bold and willing to leave [Florida], facing substantial consequences if he violates the terms of his probation, willing to violate that probation and leave without permission, bring large quantities of cocaine to this state, having gone through a number of states on his way. The rule of law really doesn't slow him down or affect him at all. I think that's demonstrated. The threat of prison sentence doesn't. Probationary supervision doesn't. So there really isn't much in his character that would indicate his sentence ought to be lenient. In fact, it argues that it should be high.

The next thing is the nature of the offense. I have commented on this, on what, when we were talking about these quantities and trafficking in the state, that he did and within an organization where people have in fact been killed, the nature of the offense is quite serious.

The probation officer's presentence report informed the trial court that Garcia's prior conviction for second degree murder involved Garcia and a co-defendant stealing two kilograms of cocaine and a death that resulted. Garcia was originally charged with first degree murder, but agreed to testify for the prosecution in exchange for his plea of guilty to the lesser charge of second degree murder, and a probation sentence instead of a jail term. Garcia was on probation for the second degree murder conviction when he was arrested for this cocaine offense in Colorado. The presentence report also noted that Garcia "was probably involved with some type of organized crime," that he "is an admitted drug dealer," and that he "took the stand in Court and admitted that the cocaine was his." The extremely large quantity of cocaine was another consideration.[4]

The possession charge was a class 3 felony, but the special offender statute mandated that Garcia be sentenced for a term longer than the presumptive range for a class 2 felony. The presumptive range at the time for a class 3 felony was four to eight years, while the presumptive range for a class 2 felony was eight to twelve years. The trial court imposed a twenty year sentence—less than the maximum and less than the sentence requested by the prosecution, the investigating detective, and the probation department. The factual findings in the record establish that the trial judge made the necessary inquiries into the defendant's "history, background, character and criminal activities." *Duran*, 188 Colo. at 214, 533 P.2d at 1119. The specific findings and observations of the trial court as to the defendant's character, criminal activities, criminal record and history are supported by the evidence. Accordingly, we conclude that the court's imposition of a twenty year sentence was not an abuse of discretion.

**B.**

■ The defendant's second claim of error is that he was denied his right to allocution at the sentencing hearing. We disagree. Crim.P. 32 provides that "[b]efore imposing sentence, the court shall afford the defendant an opportunity to make a statement in his own behalf, and to present any information in mitigation of punishment." Crim.P. 32(b), 7B C.R.S. (1984). The rule gives a defendant "the

---

**4.** A Colorado Bureau of Investigation laboratory agent analyzed the cocaine and testified at trial that the two bags found inside the backpack contained 92.5% and 94.3% pure cocaine. A police officer testified that the street value of this quantity of cocaine in Colorado Springs was between $800,000 and $1,200,000.

right of allocution to speak in mitigation of punishment before sentencing." *People v. Doyle*, 193 Colo. 332, 333, 565 P.2d 944, 944–45 (1977). Denial of the right of allocution does not affect the jury's determination of guilt; the remedy, where appropriate, is resentencing. *Id.* at 333, 565 P.2d at 945. We have interpreted this right to mean that "[a] defendant must be notified when sentence will be pronounced, and has a right to be present in the court with legal counsel at that time. He has a right of allocution before sentence is handed down which cannot be withheld from him." *People v. Emig*, 177 Colo. 174, 177, 493 P.2d 368, 369 (1972) (quoted in *People v. Renfrow*, 199 Colo. 101, 103, 605 P.2d 915, 916 (1980)).

At Garcia's sentencing hearing, the following exchange took place:

> THE COURT: ... Is there anything that you would like to say before sentence is imposed?
>
> MR. GARCIA: I wish to say a lot. I don't know how to say.
>
> THE COURT: You have that opportunity. If there is anything you would say, I will listen.
>
> MR. GARCIA: I don't know how to speak English. That is the problem.

The court then imposed judgment and a sentence of twenty years at Department of Corrections plus one year of parole. The defendant contends that this exchange establishes that he was deprived of his right to speak on his behalf, therefore his sentence is invalid.

On review of the record as a whole, we conclude that this argument is without merit. At the preliminary hearing, the court made a lengthy inquiry into the defendant's ability to speak and understand English. The court directed the following questioning of Detective Butler, who had arrested Garcia and spoken with him at the time of his arrest.

> THE COURT: ... I do have a responsibility to provide Mr. Garcia with an interpreter if he legitimately does have a language problem. I would ask you [the prosecutor] to ask this witness [Detective Butler] whether or not his conversation with Mr. Garcia was in Spanish or English, whether or not the conversation in the car with Officer Kram [the transporting officer] or conversation or statement made at the cubicle [was] in Spanish or English.
>
> Q. [prosecutor] Do you speak Spanish, Detective Butler?
>
> A. [detective] I do not.
>
> Q. When you had a conversation with Mr. Garcia, was it in English?
>
> A. Yes, it was.
>
> Q. When Officer Kram—When he heard those statements by Mr. Garcia, was that in English or Spanish?
>
> A. Everything was in English.
>
> Q. How long was your conversation with Mr. Garcia in English?
>
> A. Anywhere from 25 to 35 minutes. He understood me very well. I understood him very well.
>
> . . . .
>
> Before he was transported, I advised him of his constitutional rights.
>
> Q. Did he appear to understand the English language, at least those rights that you gave him?
>
> A. He told me he did.
>
> Q. Did you ever ask him if he understood English?
>
> A. Yes. After I advised him of his rights under the *Miranda* ruling I asked if he understood the rights. He said, "Yes." I asked, "Do you wish to make any statements?" He said, "Not until I talk to Steve [Solar]."
>
> Q. In English?
>
> A. In English, yes.
>
> . . . .
>
> I asked him a lot of questions pertaining to Colorado Springs that he responded to.
>
> Q. Did they seem appropriate responses to your questions?
>
> A. They were very appropriate responses.
>
> Q. Did he question you as well?
>
> A. Yes, he did.
>
> Q. Did you respond to his questioning?
>
> A. Yes, I did.

Q. Do you know whether or not his questions indicated to you that he knew what he was talking about? Were they babbling questions or understandable questions, as far as you were concerned?

A. I understood them very well.

Q. Were they also in English?

A. Yes, they were.

Q. Were your responses in English?

A. Yes, they were.

The court then questioned the detective:

BY THE COURT:

Q. Did you ever have to repeat anything for him to make sure he was understanding?

A. [detective] Every once in a while, if he didn't quite understand a certain word, I would have to re-explain that to him. That would be the only thing. I felt that he understood the full context of my conversation.

Q. How many times, if you remember, did you have to explain a word to him?

A. Two or three times out of 25 to 35 minute conversation.

Q. Word selection that you were using, was it any different than the way you have been talking in your testimony today?

A. Not too much different. It may be some slang terms that I might normally use to interview a witness as compared to testifying on the stand.

At this point, the prosecutor noted that the assistance of a Spanish-speaking police officer who sometimes acted as an interpreter was available. The court responded: "I don't think it's necessary to have him."

The defendant now argues that "Mr. Garcia was anxious to address the Court, but was unable to express what he wanted to say because of an inability to communicate effectively in English." Appellant's Opening Brief at 10–11 (footnote omitted). The cases relied on by the defendant generally involve situations where a defendant is absent from his own sentencing hearing. *See Renfrow,* 199 Colo. at 103, 605 P.2d at 916 (When an appellant is being resentenced, the sentencing court is required to hold "a [sentencing] hearing at which appellant should be present."); *Emig,* 177 Colo. at 175–77, 493 P.2d at 370 (When the trial court changed the defendant's sentence *sua sponte* without notice to him, out of his presence, and without a hearing, the right of allocution was impermissibly denied and resentencing is required.).

In the case before us, the defendant was present at sentencing with counsel. The record shows that he was able to adequately communicate in the English language. On its own initiative, the trial court had engaged in lengthy questioning at the preliminary hearing to determine whether the defendant needed an interpreter, and concluded that an interpreter was not necessary. The record also shows that Garcia appeared *pro se* at one pretrial hearing, before trial counsel had been appointed, and brought his own interpreter with him. Garcia and his attorney were both present at sentencing, but neither one requested an interpreter. We have held that, under Crim.P. 32 the defendant "must be notified when sentence will be pronounced" and "has a right to be present in the court with legal counsel at that time." *Emig,* 177 Colo. at 177, 493 P.2d at 369. Garcia was notified, was present, and had legal counsel at the sentencing hearing. His last-minute assertion that he could not communicate in English, based on the other facts and proceedings in the record, does not convince us that Garcia was denied the right of allocution. The record does not support the conclusion that the defendant was impermissibly denied his right to speak on his own behalf at sentencing. Therefore, we reject the defendant's claim.

### C.

■ The defendant's third claim of error is that the trial court abused its discretion in denying his Motion for Disclosure of Informant, which was made prior to the suppression hearing and at the time trial commenced. We disagree. Prior to trial, the defendant filed a motion asking that the trial court require the prosecution to disclose the informant's identity; defense counsel's position was that his client sought disclosure "more ... for purposes

of the suppression motion than ... for trial." This motion was denied. Defense counsel filed a motion three months later asking that the trial court order the prosecution to provide the defense with a list of certain information about the confidential informant, including all instances when the informant had provided accurate information, instances when inaccurate information was received from the informant, and the informant's arrest record and criminal convictions. This motion was granted. When trial began, the informant's identity was again raised as an issue, and the court again declined to order disclosure of the informant's identity.

The argument supporting Garcia's initial disclosure request was that testimony at the pretrial hearings established that the only information supporting probable cause for Garcia's arrest and the resulting searches was information obtained from an unreliable confidential informant. Defense counsel also asserted that if the informant were required to testify, the informant would give a version of the conversation with Officer Butler that would differ significantly from Butler's own testimony. Finally, disclosure was sought on the ground that "anything that informant might say about his conversation with Stephenson Solar would be very, very relevant to establishing the ownership of those drugs." The court declined to order disclosure of the informant's identity after applying the five-part test in *People v. Marquez,* 190 Colo. 255, 258–59, 546 P.2d 482, 485 (1976) (adopting *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 239 (1957)), but did order the prosecution to disclose certain information about the informant, as long as identity was not revealed.

 In deciding whether a confidential informant's identity should be disclosed, a trial court must apply a balancing test, weighing the "public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957). The defendant must make a showing that dis-

closure is necessary to enable him to prepare a meaningful defense. *People v. Arnold,* 186 Colo. 372, 527 P.2d 806 (1974). This balancing test is applied on a case-by-case basis and "some of the many factors that must be considered" include the following: whether the informant was an eyewitness or earwitness; whether the informant is available or could be made available by the exercise of reasonable diligence; whether other witnesses can testify to the likelihood that the informant's testimony will vary significantly from other witnesses' testimony; whether the defendant knew or could without undue effort discover the informant's identity; and whether the informant was peripherally or deeply involved in the criminal transaction. *Marquez,* 190 Colo. at 258, 546 P.2d at 485. "[T]he accused must at least make some minimal affirmative showing of this need for disclosure." *Id.* at 259, 546 P.2d at 485.

 In applying this balancing test, a trial court's final ruling on the disclosure motion is discretionary; each case turns on its own facts. *People v. Roy,* 723 P.2d 1345, 1347 (Colo.1986); *People v. Korte,* 198 Colo. 474, 602 P.2d 2 (1979). If a trial judge is convinced that police officers relied in good faith on credible information supplied by a reliable informant, the informant's identity need not be disclosed at a suppression hearing. If disclosure of an informant's identity is necessary to fair determination of a suppression motion, the trial court in its discretion may order disclosure. *People v. Bueno,* 646 P.2d 931 (Colo.1982). However, a judge who has doubts about the informant's credibility can require that the informant be identified or even produced. *DeLaCruz v. People,* 177 Colo. 46, 51–52, 492 P.2d 627, 629–30 (1972).

 The burden is on the defendant requesting disclosure to make "an initial showing that the informant will provide information essential to the merits of his suppression ruling." *Bueno,* 646 P.2d at 935–36. To make this showing, the defendant must establish a reasonable basis in fact to believe one of two things: either that the informant does not exist, or that the informant did not give the police the

information on which they purportedly relied as probable cause for the arrest or search. *Id.* at 936.

■ Generally, disclosure is justified if the accused can show that the informant either witnessed or participated in the crime. *Id.* Cases in which we have found an abuse of discretion in the trial court's refusal to order disclosure of an informant's identity have typically involved an informant who is an eyewitness or earwitness to the crime itself. *Id. See, e.g., People v. Duran,* 188 Colo. 420, 422, 535 P.2d 505, 506 (1975) (Trial court erred in denying the defendant's motion for disclosure when "the informant was unquestionably an eyewitness and an earwitness to the [drug] sales transaction."); *People v. Musgrave,* 187 Colo. 135, 137, 529 P.2d 313, 314 (1974) ("When it was established that the purported informant was an eyewitness and earwitness to the sale, and participated to the extent that he did, the court should have ordered disclosure of the informant's identity.").

Counsel's arguments addressed "the different criteria that the Court is to look at," and the record shows that the trial court relied on the *Marquez* five-part test in denying the defendant's Motion to Disclose the Informant. The trial court heard all of the testimony, including the allegedly contradictory testimony given by Detective Butler at the pretrial hearings. The trial court was required to review the evidence and apply the five-part *Marquez* test. Its ruling is not subject to reversal unless the record shows no evidence to support it. That is not the case here; there is ample evidence in the record showing that the

attorneys raised the relevant factual considerations in argument, and the judge concluded that disclosure of the identity was not necessary.

The defendant's burden in this case was to establish a reasonable basis in fact that the informant did not give the police the information on which they relied for probable cause. The defendant did not meet this burden, and there is evidence in the record supporting the trial court's denial of the Motion for Disclosure of the Informant. We reject the defendant's claim of error.

### D.

The defendant's fourth claim of error is that the trial court abused its discretion when it denied his Motion to Suppress Evidence and Statements as the products of an allegedly illegal warrantless arrest. We disagree. The defendant filed a motion asking the trial court to suppress the following: the property seized from the Jeep, including the cocaine; evidence seized from the motel room at the Ramada Inn; and any statements by Garcia after his arrest, made to or heard by law enforcement officers.[5] Garcia requested suppression on the grounds that the officers lacked probable cause for his arrest or for the searches.

A hearing was held at which the prosecution relied on *DeLaCruz v. People,* 177 Colo. 46, 492 P.2d 627 (1972), in arguing against suppression. The trial court denied the suppression motion in part and granted it in part, applying a "totality of the circumstances" analysis. In support of its finding of probable cause, the court made lengthy findings of fact and conclusions on the record.[6] The court declined to suppress the evidence seized from the Jeep

---

**5.** Immediately after his arrest, the defendant requested to speak with Stephenson Solar, who was also under arrest. The police permitted him to do so, but two police officers were present during the conversation, one of whom spoke Spanish. The police felt it necessary that they at least be present during the conversation between Garcia and Solar in case they were going to "plan anything" or "get together to match stories."

**6.** In terms of legal conclusions, I think that there is not sufficient reliability in the conversation between the informant and Officer Butler on the morning of the 26th, to pass the

*Aguilar–Spinelli* requirements. The conversation does have some specific information in it in some detail, but in applying it to an informant, whose reliability has not been, in the Court's opinion, tested sufficiently to establish in and of itself reliability through past dealings or a history with him. There is not, in the Court's opinion, sufficient detail linked with the history with this informant to find from that history and from the conversation itself the reliability requirement. There is though, I think, when taking the information provided by the informant to the location of the Knob Hill Body Shop and the observa-

and the statements made by Garcia, holding that the officers had probable cause to stop, arrest, and search Rodriguez, probable cause to believe that cocaine was contained in the backpack, and probable cause to stop and search the Jeep. The court also found probable cause to conduct a warrantless arrest of Garcia,[7] and the presence of exigent circumstances further justifying the arrest and the search of the Jeep.[8] The court held that the information given by the informant, combined with the observations of the surveilling officers, "established reasonable grounds to believe that all three of the individuals were involved in the crimes of possession of cocaine and possession of that with an intent to distribute or sell it."

The court granted the suppression motion as to the evidence seized from the motel room—a twenty dollar bill with cocaine in it, found on a television set—because the prosecution failed to establish exigent circumstances to justify a warrantless search of the motel room.

In *DeLaCruz v. People*, 177 Colo. 46, 492 P.2d 627 (1972), this court addressed the constitutionality of a warrantless arrest and the resulting search and seizure of contraband under very similar facts. The police officer in *DeLaCruz* testified that he received a telephone call from a "confidential, reliable informant" who said that three men (two identified by name) would be in a particular area in fifteen minutes with heroin in their possession. *Id.* at 48, 492 P.2d at 629. The informant described in some detail the vehicle the three men would be using. *Id.* When the officers saw this

tions of the officers, sufficient corroboration of what the informant claimed would occur and what was actually occurring at the body shop to establish reliability from those circumstances actually observed by the officers themselves. That, linked with the information given by the informant, established reasonable grounds to believe that all three of the individuals were involved in the crimes of possession of cocaine and possession of that with an intent to distribute or sell it; that, in fact, the cocaine is contained in the particular container or article that was being carried by the female. It had been a part of the information received by the informant that she would be carrying the drugs, and on the two occasions that the officers were able to observe the female, both at Knob Hill and later at Ramada Inn, indeed she did have a case or knapsack in the appropriate size, in the officer's opinion, to carry two kilograms of cocaine. She did keep it solely in her possession.

Additionally, the probable cause to believe that the cocaine was contained within that particular item is bolstered by the fact when the male parties left the Ramada Inn, they did not have it. The Court's aware of the fact, certainly, women do carry at times larger purses or satchels than a man might. I think there is a consistency in this particular satchel, the way it was being carried by the female, to be reasonable grounds to believe that cocaine was in it. I think furtive gestures, in and of itself, doesn't establish probable cause, but her treatment of the satchel being on the floorboard area, looking in that area of the automobile where the satchel was in fact found at a later point, generally seeing her move the bag down or being down in that area and then begin her conduct in looking around the immediate area of the parking lot,

tends to corroborate the notion that she has the cocaine and that it must be contained in the object that is of a size that would be sufficient to hold it.

So I think then, just basically to summarize, the Court is satisfied that the officers did have probable cause to arrest Helen Rodriguez.

7. The court held:

Under the [*United States v.*] *Watson* decision, they did have probable cause to arrest Mr. Garcia. He was in a public area when he was finally located. They could affect an arrest of him without a warrant, so the arrest of Garcia is legal.

I take it that that is going to lead to some questions about whether or not statements can be used against him to the extent those statements might be the result of or the product of that arrest. Those too are legally obtained and can be used against him.

8. I find there are [exigent circumstances to justify Rodriguez' arrest, the search of the Jeep, and probable cause to arrest Garcia]. The exigent circumstances are found in the fact the officers were spread fairly thin. In my factual finding I talked about that, the fact that other officers were beginning to arrive on the scene, had not actually gotten there, were not versed or knowledgeable about what it was that was going on, and that the party with the cocaine was moving to a foreign location. There were difficulties, if she were going to a specific location that the officers believed that she was in fact going. There was a connection and information that they had between Mr. Harpstrite, the Vazquezes and this particular Defendant, and it's in that context that the exigent circumstances arise.

vehicle carrying two of the three men described, they stopped the car and arrested and searched the two men; one was the defendant. A container of heroin was found in the defendant's pocket and he filed a motion to suppress the evidence, claiming that the officers lacked probable cause for his arrest. This court held that exigent circumstances permitted the warrantless arrest in *DeLaCruz* because "[t]ime was of the essence in this case, and the police officers had the choice of either acting upon the information which they had obtained or of allowing the narcotics violation to escape detection." [9] *Id.* at 49, 491 P.2d at 629.

A warrantless arrest is constitutionally permissible if it is supported by probable cause. *People v. Villiard,* 679 P.2d 593, 597 (Colo.1984). "A warrantless search is presumed to violate the constitutional provisions forbidding unreasonable searches," U.S. Const. amend. IV; Colo. Const. art. II, § 7, and the burden is on the prosecution to establish that a warrantless search falls within one of the narrowly defined exceptions to the warrant requirement. *People v. Jansen,* 713 P.2d 907, 911 (Colo.1986). One recognized exception is the exigent circumstances exception which justifies a warrantless search and seizure when the prosecution establishes both the existence of probable cause to search and exigent circumstances justifying the immediate police action. *Id.; People v. Turner,* 660 P.2d 1284, 1287 (Colo.1983).

■ Although the constitutional requirement of a warrant can be excused under exigent circumstances, the probable cause requirements are at least as strict in a warrantless search as in a search pursuant to a warrant. *People v. Thompson,* 185 Colo. 208, 523 P.2d 128 (1974). The doctrine of exigent circumstances applies when there is a compelling need for imme-

diate police action. *People v. Gomez,* 632 P.2d 586 (1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). The threat of immediate destruction or removal of evidence constitutes an exigent circumstance if the prosecution can demonstrate that the police had an articulable basis to justify a reasonable belief that evidence was about to be removed or destroyed. *People v. Turner,* 660 P.2d 1284 (Colo. 1983).

■ The trial court correctly relied on *DeLaCruz* because of the similarity of the facts to the case at bar. As in *DeLaCruz,* the police had information from an informant describing suspects by name, expected at a specified location at a particular time, in a vehicle identified to some degree, with contraband in their possession. Here, the officers were told to expect a man named Victor "Manny" Garcia, a man named "Steve," [10] and an unidentified woman, in a vehicle with Florida plates, at the Knob Hill Body Shop, on the morning of March 26, 1983. The surveilling officers observed two men and a woman, in a vehicle with Florida license plates, at the body shop at the date and time expected. We conclude, based on *DeLaCruz,* that the trial court correctly held that the officers had probable cause to conduct a warrantless arrest.

■ In support of its holding that the police were justified in opening the backpack, the court made the following findings:

> There is ... sufficient corroboration of what the informant claimed would occur and what was actually occurring at the body shop to establish reliability from those circumstances actually observed by the officers themselves. That, linked with the information given by the informant, established reasonable grounds to

**9.** The court applied the two-pronged *Aguilar–Spinelli* test in *DeLaCruz;* that holding was prior to our adoption of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), in *People v. Pannebaker,* 714 P.2d 904 (Colo.1986).

**10.** One of the conflicts in Detective Butler's testimony was whether the informant had given the name "Steve" for the second man. Butler testi-

fied at one point that he had been given the name "Steve," but apparently testified later that the informant had not named the second man traveling with Garcia. In the court's findings of fact, it found that the informant did identify the man as "Steve" when speaking with Detective Butler.

believe ... that, in fact, the cocaine [was] contained in the particular container or article that was being carried by the female. It had been a part of the information received by the informant that she would be carrying the drugs, and on the two occasions that the officers were able to observe the female, both at Knob Hill and later at Ramada Inn, indeed she did have a case or knapsack in the appropriate size, in the officer's opinion, to carry two kilograms of cocaine. She did keep it solely in her possession.

Additionally, the probable cause to believe that the cocaine was contained within that particular item is bolstered by the fact when the male parties left the Ramada Inn, they did not have it.

. . . .

I think there is a consistency in this particular satchel, the way it was being carried by the female, to be reasonable grounds to believe that cocaine was in it. I think furtive gestures, in and of itself, doesn't establish probable cause, but her treatment of the satchel being on the floorboard area, looking in that area of the automobile where the satchel was in fact found at a later point, generally seeing her move the bag down or being down in that area and then begin her conduct in looking around the immediate area of the parking lot, tends to corroborate the notion that she has the cocaine and that it must be contained in the object that is of a size that would be sufficient to hold it.

... There is justification under *U.S. v. Felton* for the seizure and search of the satchel merely within that context.

In addition to that, they also had probable cause to believe that cocaine was contained within that satchel. They had probable cause to stop the Wagoneer, seize that container and search it under that independent basis. So it's for those reasons that the Court has denied the motion to suppress.

These findings of fact rest on the particular circumstances of this case. The court's lengthy findings are supported by the testimony and the other evidence in the record. As a result, we are bound by the trial court's findings. We uphold the suppression rulings and reject the defendant's claim of error.

### E.

The defendant's fifth claim of error is that he was denied a fair trial due to certain jurors' discussions during deliberations of a newspaper article about his arrest; he asserts that the incident in question constituted juror misconduct and contamination. We disagree. After the close of evidence, during jury deliberations, one juror remembered that she had read a newspaper article at the time of Garcia's arrest. The juror's recollection was that the article indicated "that the defendant and his codefendants had come to the State of Colorado from Florida for the purpose of selling cocaine to raise bond money for the release of certain defendants in a[n] unrelated action." The defendant's motion asserted that this juror communicated her recollection of the newspaper article to a few other jurors, and that this information was "so inherently prejudicial to the defendant's ability to obtain a fair trial that this Court should conclusively presume that prejudice has occurred."

At the hearing on the new trial motion, the defendant presented affidavits and sought to introduce oral testimony by several jurors describing the conversations that occurred in the jury room regarding this newspaper article. Defense counsel made an offer of proof, advising the judge that he and his wife had heard about the jurors' discussions from two jurors the evening after the trial. Counsel told the judge:

[O]ne of the two jurors mentioned she hadn't realized until the deliberations had started in the case this, in fact, was the case she had read about where Mr. Garcia and his friends had come out with the two kilograms of cocaine to bail out the Vazquezes [sic]. She remembered that and communicated her memory of that to other members of the jury. That's how it came to my attention. That's basically

the substance of what I would be calling her to testify to....

That is basically what we would be eliciting as evidence.

The trial court ruled that "the information that's being sought by way of affidavit and oral testimony is not admissible and will not be received by the Court under [CRE] 606, subsection [b]." It held that the proffered evidence went to "the internal operation and decision-making process of the jury deliberation," hence was specifically excluded under CRE 606(b). The court also held that this incident did not prejudice the defendant.[11] In an addendum to his Motion for New Trial, the defendant asserted that the court additionally erred when it excluded the testimony and affidavits of jurors at the post-trial hearing.

■■■ The issue before us is whether the trial court erred in denying the defendant's motion for new trial because of the jury's alleged misconduct. The general rule is that an attempt to impeach a jury verdict must meet two requirements. First, the party seeking impeachment must produce competent evidence to attack the verdict. Second, the party must establish adequate grounds to overturn the verdict. *Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 148 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). To establish adequate grounds to overturn the verdict, the defendant must establish that he has been prejudiced by the alleged jury misconduct. CRE 606(b) governs evidence that goes to the validity of a verdict or indictment and provides as follows:

### Rule 606. Competency of Juror as Witness

. . . .

(b) **Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether *extraneous prejudicial information* was improperly brought to the jurors' attention or whether any *outside influence* was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

(Emphasis added).

To meet the competent evidence requirement, the evidence must be admissible under CRE 606(b). We have held that delving into the mental process of jury deliberations is not permitted. *Santilli v. Pueblo*, 184 Colo. 432, 521 P.2d 170 (1974). "Generally, a verdict in a criminal case may not be impeached by affidavits of jurors," although an affidavit can be used to impeach a verdict "if there ha[ve] been external influences on the jury" or jury misconduct. *People v. Collins*, 730 P.2d 293, 301 (Colo. 1986). Affidavits concerning the mental processes of jurors during deliberations are inadmissible under CRE 606(b). " 'Extraneous influence' has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and commu-

11. The trial court made the following findings:
In this case, in the voir dire process and the preliminary remarks which the Court gave to the jury, ... the Court stressed on numerous occasions the case could only be decided on evidence received from witnesses testifying from the witness stand and under oath and any exhibits that might be offered through them and received in evidence....
Finally, the Court feels, even if we were to view this as something extrinsic or not internally on the thought process itself, that it's not of such a nature that the Court can conclude as a matter of law that there would be probability or possible effect on the decision-making process by the information. It's true that the evidence was silent as to any motive. The People didn't offer motive for possession or importation. I don't think this particular bit of information was of such a nature that we can conclude with reasonable probability or likelihood that it had some effect on the jury's process or was the kind of thing that would have pulled them away from their sworn responsibility.

nications or other contact between jurors and third persons." *Virgin Islands*, 523 F.2d at 149 (footnotes omitted). "By contrast, evidence of discussions among jurors ... is within the rule [CRE 606], rather than the exception, and is not competent to impeach a verdict." *Id.* at 149–50. Even if we assume that the defendant has established jury misconduct, we cannot overturn a conviction unless the defendant also establishes that he suffered prejudice as a result of the misconduct. *People v. Hernandez*, 695 P.2d 308, 310 (Colo.App.1984) (When juror realized during the trial that she knew the defendant, but was unable to notify the court, and testified that this knowledge did not affect her verdict, conviction was nevertheless upheld because the defendant did not establish prejudice.).

The determination of whether prejudice has occurred is a ruling within the sound discretion of the trial court. *People v. Heller*, 698 P.2d 1357 (Colo.App.1984), *rev'd on other grounds*, 712 P.2d 1023 (Colo.1986). The defendant presented a similar argument in *Heller* when the trial court refused to hold an evidentiary hearing to inquire into jury misconduct, based on the allegation that a few jurors learned, during deliberations, of a guilty plea entered by one co-defendant and the capture of a second co-defendant. Five of the jurors learned of the co-defendants' plea and capture "at the conclusion of their deliberations" or "after their deliberations were completed," according to the affidavit. 698 P.2d at 1363. The court of appeals described this information as "unverified conjectures" which "failed to demonstrate that any extraneous influence came to bear upon the jury or that he was prejudiced thereby." *Id.* at 1363, 1364.

Even if the conduct complained of fell within one of the exceptions to CRE 606(b), the defendant failed to establish that he was prejudiced. The trial court held, and we agree, that even if this jury discussion constituted an extraneous influence, the de-

fendant was not impermissibly prejudiced. The evidence of guilt in this case was overwhelming, since the defendant had been under surveillance and was observed by several different officers. Rodriquez gave testimony that was consistent with the other evidence before the jury. She testified that Garcia planned the trip, requested that she and Solar accompany him, and offered to pay their expenses. She testified that the purpose of the trip was for Garcia to sell the cocaine in the backpack to his contacts in Colorado. In light of the evidence in the record, we fail to discern prejudice to the defendant arising from this conversation among a few jurors.

We conclude that the trial court did not abuse its discretion in holding that whatever conversation took place among the jurors did not result in prejudice to the defendant. The trial court correctly denied the motion for new trial.

## F.

The defendant's sixth claim of error is that the special offender statute, section 18–18–107(1)(d), 8B C.R.S. (1986), is unconstitutional. We disagree. Section 18–18–107(1)(d) states that upon a felony conviction of a controlled substance offense "the presence of any one or more of the following *extraordinary aggravating circumstances* designating the defendant a special offender" mandates that the court impose a sentence greater than the presumptive range, but not more than twice the maximum of the presumptive range, for a class 2 felony. § 18–18–107(1) (emphasis added). The statute expressly defines extraordinary aggravating circumstances in controlled substance offenses; these sentence enhancement provisions [12] limit the district court's sentencing discretion. *Felts v. County Court*, 725 P.2d 61 (Colo.App. 1986).

The extraordinary aggravating circumstance in this case is that the defendant

---

12. In *People v. Lacey*, 723 P.2d 111 (Colo.1986), we defined a sentence enhancement statute as "a statute which enhances the minimum sentence that the substantive offense would ordinarily carry." *Id.* at 113. Because the special offender statute before us meets that definition, we conclude that the special offender statute is a sentence enhancement statute for purposes of this analysis.

"unlawfully introduced, distributed, or imported into the State of Colorado any ... controlled substance ... or, with the intent to promote or facilitate the introduction, distribution, or importation of any ... controlled substance ... into the State of Colorado, he aided, abetted, or advised another person." § 18–18–107(1)(d).

The defendant first raises the argument that the statute unconstitutionally violates due process rights [13] because it is so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to its application. In contrast, a statute satisfies due process requirements when it provides fair notice of the unlawful conduct. *Smith v. Charnes*, 728 P.2d 1287 (Colo.1986). Due process is satisfied if the statutory terms "are sufficiently clear to persons of ordinary intelligence to afford a practical guide for law-abiding behavior and are capable of application in an even-handed manner by those responsible for enforcing the law." *People v. Gross*, 670 P.2d 799, 800 (Colo. 1983). A statute is void on its face only when it "provides no discernible standards at all for defining any proscribed conduct." *Id.* at 801.

A statute is presumed constitutional, and the party challenging the statute must establish its unconstitutionality beyond a reasonable doubt. *People v. Moore*, 674 P.2d 354, 357 (Colo.1984). We are required to construe a statute in a constitutional manner "whenever a reasonable and practical construction may be applied to it." *People v. Moyer*, 670 P.2d 785, 789 (Colo.1983).

The legislature did not define the terms found in the special offender statute. The defendant did not specify which words or phrases of the statute he considers to be vague. Review of the applicable extraordinary aggravating circumstance convinces us that this provision is not unconstitutionally vague. It provides for enhanced sentencing if a defendant has unlawfully "introduced, distributed, or imported" a controlled substance into Colorado. In lieu of a legislative definition, we look for the ordinary and commonplace definitions. *Webster's Third New International Dictio-*

*nary* defines "introduce" as: "to lead, bring, conduct, or usher in." "Import" is defined as: "to bring or carry into ... to bring from a foreign or external source." "Distribute" is defined as: "to divide among several or many: deal out: apportion ... dispense."

These definitions serve to provide fair notice of the unlawful conduct proscribed by the legislature. A defendant is subject to enhanced punishment if, after being convicted of certain controlled substance offenses, it is also determined that he unlawfully introduced, distributed, or imported into Colorado a schedule I or II controlled substance. A practical construction of this language would be to bring the controlled substance into Colorado, to bring from a foreign or external source outside Colorado, or to deal or dispense a controlled substance into this state. Based on the terms and their commonly understood definitions, we are convinced that section 18–18–107(1)(d) is capable of constitutional construction. Accordingly, we reject the defendant's vagueness challenge.

We also find the defendant's overbreadth challenge to be without merit. The overbreadth doctrine "prevents the state from regulating conduct by encroaching on basic constitutional rights, such as speech and assembly, which may be within the sweep of the statutory prohibition." *People v. Andrews*, 632 P.2d 1012, 1016 (Colo.1981) (quoted in *People v. Aalbu*, 696 P.2d 796, 805 (Colo.1985)). Just as we held in *Aalbu* that "[t]here is no constitutionally protected right of expression in soliciting another to commit a crime," we conclude here that there is no constitutionally protected right of expression in introducing, distributing, or importing a controlled substance into Colorado. 696 P.2d at 805.

The defendant's equal protection argument is also without merit, based on our analysis in *People v. Lacey*, 723 P.2d 111 (Colo.1986). "The right to equal protection of the law guarantees only that all parties who are similarly situated receive like treatment by the law." *People v. Childs*, 199 Colo. 436, 438, 610 P.2d 101, 102 (1980). We addressed an equal protec-

---

**13.** Due process is required under U.S. Const. amend. XIV, § 1; Colo. Const. art. II, § 25.

tion challenge to Colorado's "crime of violence" enhanced punishment statute in *People v. Haymaker*, 716 P.2d 110 (Colo.1986) (upholding constitutionality of section 18–1–105(9)(a)(I), 8 C.R.S. (1985 Supp.)). In *Haymaker*, we noted that " 'where two statutes with unequal penalties proscribe the same act, the defendant convicted under the harsher statute is denied equal protection of the law.' " 716 P.2d at 115 (quoting *People v. Calvaresi*, 188 Colo. 277, 281, 534 P.2d 316, 318 (1975)).

The defendant's equal protection argument is without merit because the special offender statute does not proscribe precisely the same unlawful act. Sentence enhancement is required only when the defendant has unlawfully introduced, distributed, or imported the controlled substance into the state of Colorado. A defendant is thus subject to sentence enhancement if he has brought a controlled substance from outside Colorado into this state. Further, any defendant who is convicted of a controlled substance offense, and as part of that criminal act, also unlawfully introduced, distributed, or imported the controlled substance into Colorado is subject to the special offender statute.[14] We reject the defendant's argument and find the special offender statute constitutional.[15]

### G.

The defendant's final claim is that the trial court erred in not conducting a

---

**14.** We note that the prosecution has discretion to charge the defendant under the special offender statute, but this discretion does not result in an equal protection violation. "Prosecutorial discretion in the decision of whether to charge a defendant with a particular offense, in the absence of evidence showing selectivity in enforcement based on invidious classification, does not amount to a denial of equal protection." *Haymaker*, 716 P.2d at 115 n. 8.

**15.** We find the remainder of the defendant's constitutional arguments to be without merit, and decline to address them.

**16.** The defendant attempts to draw an analogy between the special offender statute and the habitual criminal statute, sections 16–13–101 to –103, 8A C.R.S. (1986), to support the contention that a bifurcated trial is required. We do not find this analogy persuasive. The habitual criminal act provides that a sentencing court must consider a defendant's prior convictions in determining whether increased punishment is

---

bifurcated trial on the special offender count. We disagree. At trial, the jury was given a special verdict form on which the jury foreperson marked two boxes indicating that the jury found that the defendant (1) did knowingly import or introduce cocaine into Colorado, and (2) did "with the intent to promote or facilitate the introduction of cocaine into the State of Colorado, aid, abet or advise another person, namely Helen Rodriguez or Stephenson Solar, to introduce or distribute cocaine into the State of Colorado." This verdict form tracked the language of the special offender statute, section 18–18–107(1)(d), 8B C.R.S. (1986). The defendant contends that the prosecution erred when it filed a charge for purposes of special offender status as count two of the information. Specifically, he asks us to engraft the proceedings found in the Habitual Criminal Act, sections 16–13–101 to –103, 8A C.R.S. (1986), onto the special offender statute. We decline to do so.

The special offender statute does not provide for a bifurcated trial; it is analogous to the crime of violence sentence enhancement statute, section 16–11–309, 8A C.R.S. (1986).[16] *See People v. Russo*, 713 P.2d 356 (Colo.1986) ("[T]he special [crime of violence] finding serves as the basis for the mandatory sentence which must be imposed on the defendant's conviction for the separately charged substantive offense." *Id.* at 364.) Here, the defendant was

---

mandated under the statute. *Casias v. People*, 148 Colo. 544, 367 P.2d 327 (1961), *cert. denied*, 369 U.S. 862, 82 S.Ct. 952, 8 L.Ed.2d 20 (1962). Increased punishment can be imposed only when prior convictions have been proven beyond a reasonable doubt. *People v. Thomas*, 189 Colo. 490, 542 P.2d 387 (1975). In habitual criminal proceedings, a defendant is permitted to attack the constitutionality of prior convictions. *People v. Gonzales*, 38 Colo.App. 522, 565 P.2d 945 (1977).

The legislature included in the habitual criminal statute an entire section outlining the procedures to be followed in a habitual criminal proceeding, including a separate sentencing hearing and verdict, identification of each alleged former conviction, and proof of prior convictions beyond a reasonable doubt. § 16–13–103(1 to 3). These statutory procedures mandate a bifurcated trial and a separate verdict; as such, they are manifestations of the legislative intent to require that a habitual criminal adjudication be in accord with procedural

charged by information under the special offender statute, and was therefore on notice that he was subject to enhanced sentencing. Defense counsel filed a motion to dismiss the special offender count, which was denied. A special interrogatory was submitted to the jury for its findings on the special offender count. *See People v. Grable*, 43 Colo.App. 518, 520, 611 P.2d 588, 590 (1979) (Under crime of violence statute, "a special interrogatory ... must be submitted to the jury."). The jury was instructed that the beyond a reasonable doubt burden of proof applied to the special offender count. *See Russo*, 713 P.2d at 364 ("[T]he legislature intended the violent crime charge to be proven by the same standard of proof applicable to the trial of the substantive crime on which the violent crime charge is predicated."). We reject the defendant's argument that the court was required to hold a bifurcated trial.

We hold that the special offender statute, section 18–18–107, is constitutional. We reject the defendant's claims of error regarding evidentiary rulings and sentencing. Accordingly, we affirm the conviction and sentencing.

and constitutional safeguards. *People v. Quintana*, 634 P.2d 413 (Colo.1981); *People v. Lucero*, 200 Colo. 335, 615 P.2d 660 (1980).