**The PEOPLE of the State of Colorado, Plaintiff–Appellant, Cross–Appellee,**

v.

**James A. DRAKE, Defendant–Appellee, Cross–Appellant.**

**No. 86SA205.**

Supreme Court of Colorado,
En Banc.

Jan. 16, 1990.

As Modified on Denial of Rehearing
Feb. 20, 1990.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Robert M. Petrusak, Asst. Atty. Gen., Denver, for plaintiff-appellant/cross-appellee.

David F. Vela, Colorado State Public Defender, and Michael J. Heher, Deputy State Public Defender, Denver, for defendant-appellee/cross-appellant.

Justice VOLLACK delivered the Opinion of the Court.

Defendant James Alvey Drake appeals his conviction on the charge of accessory to the crime of murder, § 18–8–105, 8 C.R.S.

(1978).[1] The defendant contends that the trial court committed reversible error when it denied his motions to suppress statements he made to Grand Junction police officials. The defendant's suppression motions alleged that his statements were the product of his illegal arrest and the unlawful warrantless search of his motel room by Grand Junction police officers. The defendant further argues that the trial court erred in denying his motion to impose sanctions on the prosecution for violating the court's sequestration order. The defendant also argues that we must vacate his enhanced sentence under the habitual criminal counts of the amended information because his prior convictions supporting the enhanced sentence were obtained unconstitutionally and as a result of ineffective assistance of counsel. Finally, the defendant contends that the trial court's imposition of the enhanced sentence violated his right to due process of law, and that the sentence itself constitutes cruel and unusual punishment. We affirm.

### I.

At 5:25 a.m. on the morning of December 16, 1982, the Grand Junction Police Department received a telephone call on the 911 emergency line from a man who said that he had broken into an apartment in Grand Junction, and that while he was there a woman had been stabbed several times.[2] Police officers went to the apartment identified by the caller and discovered the body of Regina Renae Drake, who had been stabbed to death. There were no indications that Regina's killer had made a forced entry. Regina was the wife of Richard Drake, who is the brother of the defendant. At around 6:00 a.m. Sergeant James Hall and Detective Ron Stiles of the Grand Junction Police Department met with Richard at his place of work to inform him of his wife's death. Sergeant Hall testified that upon learning of Regina's death Richard "took [his worker's] hat off his head

and slammed it to the floor ... and let out a scream." Sergeant Hall further testified that Richard "bent over as if he was crying into his hands," but "after that was over, he raised his head up and there were no tears in his eyes or any indication that he was crying at all." Richard and the officers returned to the police station.

At the station, Sergeant Hall played the tape of the 911 call for Regina's parents and grandparents. They indicated that the caller sounded like Richard's brother Lonnie. Regina's father said the caller could possibly be the defendant. Hall then played the tape for Richard, and told Richard that Regina's father said the voice on the tape might be Lonnie's voice. Richard chuckled and said, "that is not Lonnie's voice." Detective Lester Johnson of the Grand Junction Police Department also played the tape recording of the 911 phone call for Lieutenant Richard Presnell of the Augusta, Kansas Police Department, who had grown up with the defendant and his brothers. Lieutenant Presnell told Detective Johnson that he knew without any doubt that the voice on the tape was the voice of the defendant.

At 2:00 p.m. on the afternoon of December 16th, Sergeant Hall received a telephone call from a person who identified himself as the defendant and said that he was calling from Shreveport, Louisiana. Sergeant Hall later testified that he "felt very positive" that the call was not a long-distance call and that the defendant's voice "sounded very much ... like the voice on the [911] recording." The defendant said he knew there was some sort of problem, and he asked if Richard was there and if he could talk to Richard. Sergeant Hall, who was attempting to trace the call, gave the defendant a number to call to talk to Richard, but the defendant said he would not call back. Sergeant Hall then asked the defendant if he could have his number in Shreveport, to which the defendant replied "no, I am not at home. I am at another

---

**1.** On July 8, 1986, we ordered this case consolidated with *People v. Drake,* 785 P.2d 1253 (Colo.1989).

**2.** The facts of this case are also recited in our opinion in *People v. District Court,* 711 P.2d 666

(Colo.1985). *See also People v. Drake,* 748 P.2d 1237 (Colo.1988) (appeal of Richard Drake).

phone. I have to get dressed and go to work." Shortly thereafter the Grand Junction police received a phone call from the defendant's wife Stephanie, who asked if the police knew where the defendant was. Stephanie spoke with Sergeant Hall, and told him that the defendant was supposed to be in the Grand Junction area, and that he was due back in Shreveport that day.

Sergeant Hall then contacted another sergeant of the Grand Junction Police Department and the two began searching for the defendant in Grand Junction motels. Detective Stiles then reported to Sergeant Hall that Richard had described the location of a motel in Grand Junction where the defendant was staying. Based on Richard's information, Sergeant Hall and the other sergeant proceeded to the Columbine Motel, which is located next to the building containing the pay phone from which the 911 call was made.[3] The woman at the front desk of the motel identified the defendant from a photograph the officers showed to her and stated that the defendant was staying in room 8. Sergeant Hall then called some units into the area of the motel. This took about five minutes. Sergeant Hall then telephoned the defendant in room 8. Sergeant Hall later testified about the events that followed:

A ... A male voice answered and I said, "is this James"? He said, "who is this"? I said, "I am Sergeant Hall with the police department and we have the area sealed off and I would like you to come out of the room," and I told him to keep his hands where we could see them, that I did not want anybody to get hurt and he said, "okay, I will be right out," and I went back out and told Sergeant Dibsie he was coming out. However, he

did not. There was at least 5 minutes delay and he never came out so I went back into the telephone room again and told him, "you told me that you were coming right out. We don't want to have any problems. We don't want anybody to get hurt. Would you please come out now and keep your hands on your head," and he indicated to me that he had been undressed and that he was nearly dressed now and he was putting his coat on and he would be right out and hung up the phone. I went back out, and he came out of the room at that time.

Q How far out of the room did he come?

A He stepped out of the room with his hands up and I told him, I then directed him to the center of the parking area and told him to stand there with his hands in the air and turn around and face the other direction with his back towards us, which he did.

It was approximately 3:15 p.m. when the Grand Junction police arrested the defendant in the parking lot of the Columbine Motel. His shirt, belt and pants were stained with blood. The officers patted the defendant down, handcuffed him and arrested him. Immediately after the defendant's arrest Sergeant Hall asked the defendant for permission to search the motel room. The defendant gave Hall permission to search the room and said that he had no objection to the search.[4] Sergeant Hall and another detective then entered the room and conducted a quick protective search to make sure that no one else was in the room. The officers determined that the room was empty and secured the room, but they did not search it.[5]

---

**3.** Earlier the police traced the 911 call to a pay phone in front of the Woolco store at the Eastgate Shopping Center in Grand Junction.

**4.** Sergeant Hall testified that:

Sergeant Dibsie patted [the defendant] [down] and handcuffed him and he was placed under arrest. They started to put him into a car. Before they put him in the car, I asked him if I could have permission to search his room there at the motel and he said yes, that I could have that permission, he had no objection.

**5.** Sergeant Hall testified as follows:

A I then took Detective Grimsby with me into the motel room to see if there was anybody else inside. We were concerned. We had officers in the area and we did not know that he might have had somebody in there with him that might destroy evidence or that might be a threat to us. We immediately went in and took just a quick look through the room to make sure that there was no one else in the room and I told Detective Grimsby at that time not to search, that I was going to call the police station and have Detective

Sergeant Hall then telephoned Detective Stiles and directed him and the officers holding the defendant at the station to attempt to obtain the defendant's consent to search the motel room. Detective Stiles orally advised the defendant of his *Miranda*[6] rights, and presented the defendant with a consent-to-search form which contained a written *Miranda* warning. Detective Stiles allowed the defendant to read the *Miranda* warning. After about fifteen to twenty minutes the defendant signed the consent-to-search form authorizing the officers to search room 8 of the Columbine Motel. When the defendant gave his written consent to search the room he commented that he had already given Sergeant Hall his permission to search the room. Detective Stiles notified Sergeant Hall that the defendant had signed the form and the officers conducted a search of the room.

Information obtained by the police after the defendant's arrest established that, up until his arrest, the defendant was probably destroying and disposing of evidence related to Regina's murder. During their search of room 8 the police found washcloths and towels with diluted blood on them. Gary Koverman, a criminalist agent[7] with the Colorado Bureau of Investigation, testified that the blood stains on the towels were diluted with water, indicating that someone had attempted to remove the blood from the towels, or had wiped the wet towels over a bloody surface. The police also recovered a ski jacket from the room. Sergeant Hall testified that when he found the ski jacket in the room it was damp and "felt like it may have been recently washed."

Sergeant Hall's testimony was later confirmed by a seriologist's examination which found blood in the crevices of the defendant's nylon jacket, but not on the "high points" of the jacket, from which it is eas-

ier to wipe away blood. The police also found a ski mask, gloves, and a tee-shirt in the defendant's motel room, all of them stained with blood. The day after the defendant's arrest Detective Johnson and Detective Eugene Peele found a knife on the roof of the K–Mart located about two blocks from the Columbine Motel. Detective Johnson observed dried blood on the knife at the time he found the knife.

Prior to trial the defendant moved to suppress all statements made by him to Grand Junction law enforcement officials, and statements of his overheard by those officials, on the ground that they were obtained through the exploitation of the defendant's illegal arrest at the Columbine Motel. The trial court denied the defendant's motion.

## II.

The defendant contends that the trial court erred in denying his motions to suppress because the evidence and statements he sought to suppress were obtained as a direct result of his unlawful warrantless arrest by Grand Junction Police. The issue presented by the defendant's arguments is whether his warrantless arrest by the Grand Junction Police violated the fourth amendment to the United States Constitution or article II, section 7, of the Colorado Constitution. We conclude that it did not.

In *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), the United States Supreme Court held that "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable," and that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477–78, 91 S.Ct. 2022, 2044, 29 L.Ed.2d 564

Stiles get a consent to search form and have it filled out and signed by James Drake before we conducted a search of the room.

. . . .

Q Did anybody do any searching of that room at that motel other than looking around as you have just described for possible evidence?

A At that time, no.

6. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. Mr. Koverman testified that a "criminalist agent" identifies and evaluates physical evidence "as it applies to all science matters."

(1971)). *See also McCall v. People,* 623 P.2d 397, 401 (Colo.1981). "A warrantless entry and arrest of a suspect in his home is illegal unless the prosecution establishes the existence of probable cause and exigent circumstances." *People v. Griffin,* 727 P.2d 55, 58 (Colo.1986).

The trial court concluded that "it is abundantly clear that the officers had probable cause to believe that James Drake was involved in the murder of Regina Drake. It is also clear that exigent circumstances existed which would have permitted a warrantless entry into [r]oom 8 for the purpose of arresting James." The trial court also concluded that the facts and surrounding circumstances made "it clear the consent to search was given voluntarily by James."

The trial court engaged in both fact-finding and law application to determine whether the defendant's arrest satisfied the requirements of the fourth amendment. *People v. Quezada,* 731 P.2d 730, 732 (Colo. 1987). "A court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence in the record." *Id.; see also People v. Guerin,* 769 P.2d 1068, 1071 (Colo.1989) ("[i]t was the trial court's prerogative to determine from the evidence whether the prosecution proved that exigent circumstances existed").

### A. Probable Cause

■ "Probable cause to arrest is established when it is shown that the facts and information within the arresting officers' knowledge are sufficient to cause a 'man of reasonable caution to believe that an offense has been or is being committed.'" *People v. Bustam,* 641 P.2d 968, 972 (Colo. 1982) (quoting *Lucero v. People,* 165 Colo. 315, 320, 438 P.2d 693, 695, *cert. denied,* 393 U.S. 893, 89 S.Ct. 217, 21 L.Ed.2d 173 (1968)). "[F]acts and information which support a finding of probable cause need not rise to the level of certainty." *Bustam,* 641 P.2d at 972.

In this case the record fully supports the trial court's conclusion that the Grand Junction police officers had probable cause to believe that the defendant was involved in Regina's murder. When Sergeant Hall played the tape recording of the 911 call for members of Regina's family they stated that the caller sounded like one of Richard's brothers. Regina's father said the caller might be the defendant. Lieutenant Presnell listened to the tape and positively identified the defendant as the caller. Sergeant Hall then received a call from the defendant and felt positive that the defendant had placed the 911 call and that the defendant was calling from Grand Junction. Soon thereafter Hall learned from talking to the defendant's wife that the defendant was supposed to be in the Grand Junction area. As Sergeant Hall began checking to see if the defendant was registered at a local motel, Richard confirmed to another officer that the defendant was in town, and Richard identified the location of the motel at which the defendant was staying. The information that the Grand Junction police obtained during the day on December 16th was sufficient to give Hall and the other officers probable cause to suspect that the defendant was involved in Regina's murder and that he was staying in a local motel. *People v. Turner,* 660 P.2d 1284, 1287 (Colo.1983); *see also United States v. Rengifo,* 858 F.2d 800, 804–805 (1st Cir.1988) (probable cause established when narcotics agents phoned hotel room at 3:00 a.m. and told person who answered that something "had gone wrong at the vessel," and person replied, "what happened?"), *cert. denied,* — U.S. ——, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989); *United States v. Edmondson,* 791 F.2d 1512, 1513–14 (11th Cir.1986) (probable cause established when residents of apartment building told FBI agents that photograph of bank robber matched resident of apartment building). We hold that in this case the investigating officers had probable cause to believe that the defendant was involved in Regina's murder.

### B. Exigent Circumstances

■ In *People v. Miller,* 773 P.2d 1053, 1057 (Colo.1989), we noted that in exigent circumstance cases the government bears

the heavy burden of proving that sufficient exigent circumstances created a need "that could not brook the delay incident to obtaining a warrant" (quoting *Dorman v. United States*, 435 F.2d 385, 392 (D.C.Cir. 1970)). "Exigent circumstances occur when a reasonable officer could believe that to delay acting to obtain a warrant would, in all likelihood, permanently frustrate an important police objective...." *Rengifo*, 858 F.2d at 805.

In *Miller*, 773 P.2d at 1057, we also outlined "three general categories of exigent circumstances." We noted that exigent circumstances may exist "when there is a bona fide pursuit of a fleeing suspect[,] ... a risk of immediate destruction of evidence[,] ... or a 'colorable claim of emergency threatening the life or safety of another.'" *Id.* (quoting *People v. Clements*, 661 P.2d 267, 271 (Colo.1983)); *see also McCall*, 623 P.2d at 402 (identifying same three categories and collecting cases). The determination that a warrantless search or seizure is justified under the exigent circumstances doctrine must be based on a consideration of the totality of circumstances confronting the police officers at the time the warrantless search or seizure is made. *People v. Williams*, 200 Colo. 187, 191, 613 P.2d 879, 882 .(1980); *see also United States v. Rubin*, 474 F.2d 262, 269 (3d Cir.), *cert. denied sub nom. Agran v. United States*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

The trial court's ruling that the officers' seizure of the defendant was justified by exigent circumstances is supported by competent evidence in the record. The officers knew that the defendant travelled to Grand Junction from Shreveport, Louisiana, and that he planned to immediately return to Shreveport. Sergeant Hall had learned that the defendant's wife expected the defendant back in Shreveport that day. Sergeant Hall's conversations with Richard convinced him that Richard knew of the defendant's travel plans, and that Richard knew more about the murder than he had revealed to Hall. Furthermore, the officers did not locate the defendant in the Columbine Motel until around 3:00 p.m. The investigating officers had good reason to believe that the defendant had committed a very serious crime, and that he was armed. The officers reasonably feared that if they waited to obtain a search warrant the defendant might attempt to escape when it became dark.

Exigent circumstances may exist when the police are pursuing a fleeing suspect. *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Miller*, 773 P.2d at 1057; *People v. Santisteven*, 693 P.2d 1008, 1012 (Colo.App.1984). In *People v. Beaver*, 725 P.2d 96, 98 (Colo. App.1986), the court of appeals upheld the warrantless arrest of a suspect who the police feared would soon flee across the nearby Utah border. In *People v. Garcia*, 752 P.2d 570, 580 n. 8 (Colo.1988), we upheld the trial court's ruling that exigent circumstances existed where police officers arrested the defendant as he transported a duffel bag containing cocaine in a jeep. In *Williams*, 200 Colo. at 191–92, 613 P.2d at 881, we reversed the trial court's ruling that there were no exigent circumstances justifying the defendant's arrest for possessing, selling, and dispensing cocaine. In *Williams* we held that the possibility that the defendants might escape or destroy the incriminating evidence in their possession justified the officers' entry into their home to arrest them. 613 P.2d at 882. Our conclusion that the defendants might escape or destroy the evidence was based on the fact that the police arrested another person involved in the drug transaction, and his failure to return might have made the defendants suspicious. *Id.*

In the present case the police had evidence that if the defendant was still in Grand Junction his plans called for him to leave that day. The possibility that the defendant might flee created an exigent circumstance justifying his arrest. *Garcia*, 752 P.2d at 580 n. 8; *Williams*, 200 Colo. at 191, 613 P.2d at 881; *Beaver*, 725 P.2d at 98; *see also United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987) (finding exigent circumstances where previously arrested suspects may have used two-way radio to warn defendants to flee), *cert. denied sub nom. Impemba v. United*

*States*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Milian–Rodriguez*, 759 F.2d 1558 (11th Cir.) (exigent circumstances justified warrantless arrest where suspect had previously mentioned flight as an alternative if the government did not accept his offer to cooperate), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 112 (1985). The fact that the defendant may have been in his motel room destroying incriminating evidence at the time of his arrest also created an exigency justifying the defendant's arrest. In *People v. Anaya*, 545 P.2d 1053, 1058 (Colo.App.1975), the police arrested defendant Tommy Morales without a warrant on the basis of a reliable tip. The court of appeals held that exigent circumstances made it impracticable to obtain a warrant. *Id.* The court held that "[f]urther delay might well have resulted in the cleaning or destruction of the blood and semen stained clothes which were seized from the defendants after their arrest. This need to preserve evidence is sufficient exigent circumstances to validate a warrantless arrest based on probable cause." *Id.* (citing *People v. Duleff*, 183 Colo. 213, 216, 515 P.2d 1239, 1240 (1973)); *see also Williams*, 200 Colo. at 191, 613 P.2d at 882 (urgent need for prompt arrest to prevent escape and possible destruction of contraband justified warrantless search on probable cause). In the present case further delays would have allowed the defendant to destroy evidence which helped incriminate him. The delay which would have followed had the police obtained a warrant would have frustrated an important police objective.

The defendant argues that there were no exigent circumstances justifying a warrantless arrest because the police had until the defendant's arrest at 3:15 p.m. to obtain a warrant. This argument ignores the fact that the police did not establish that the defendant was in Grand Junction until 3:00 p.m.

The warrantless arrest of the defendant by the Grand Junction Police did not violate the fourth amendment to the United States Constitution or article II, section 7 of the Colorado Constitution, because the arrest was supported by probable cause and justified by exigent circumstances. We therefore hold that the trial court did not err by denying the defendant's motions to suppress.

### C. Consent

The trial court made the following findings regarding the defendant's consent to the search of his motel room:

> [Sergeant] Hall asked James if he would consent to a search of his motel room. No undue pressure was placed on James to consent. He did not appear to the officers to be confused or extremely upset or nervous. James gave the officers his consent to search the room. However, Hall merely made a cursory check of the room at that time to determine whether there were any other persons in the room. Hall then called [Detective] Stiles at the police department and asked him to ask James for a written consent to search. James gave this to Stiles although he said that he had already told Hall he could search the room. Again, no pressure was placed on James to sign the consent form. These facts and all the surrounding circumstances make it clear that the consent to search was given voluntarily by James.

The trial court did not err in holding that the search of the defendant's motel room was valid because the defendant consented to the search.

Searches conducted pursuant to a valid grant of consent need not be supported by the issuance of a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854 (1973); *People v. Thiret*, 685 P.2d 193, 201 (Colo.1984). Courts determine whether consent to a search is timely and voluntarily given by examining the totality of the circumstances surrounding the individual's consent. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047; *Thiret*, 685 P.2d at 201. The burden is on the People to show by clear and convincing evidence that the defendant's consent was voluntarily given.

*People v. Carlson,* 677 P.2d 310, 318 (Colo. 1984). Voluntariness is a question of fact to be decided by the trial court and upheld on appeal unless clearly erroneous. *United States v. Cherry,* 794 F.2d 201, 205 (5th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).

In this case the trial court's ruling that the defendant consented to the search of his motel room was not clearly erroneous. There was no evidence that the police obtained the defendant's consent by coercive means. Detective Stiles testified that none of the officers used any coercive techniques during their interviews of the defendant, and that there was nothing coercive at all about the interviews. Detective Stiles testified that he interviewed the defendant in a normal tone of voice. The defendant "presented no evidence that [the officers] made any threats or promises to affect his judgment, nor are there claims of any other form of coercion or misrepresentation." *United States v. Sanchez–Jaramillo,* 637 F.2d 1094, 1098 (7th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980). The defendant orally consented to the search of his motel room at the scene of his arrest, and consented again in writing after he had been taken to the station. Before the defendant gave his written consent to a search of the motel room, Detective Stiles advised him orally and in writing of his *Miranda* rights. Before the defendant signed the consent-to-search form, Detective Stiles read the defendant the *Miranda* warning on the form and had the defendant read the warning himself. The defendant's comment that he had already given Sergeant Hall his permission to search the room indicates that he had no reservations about consenting to a search of the room. It was only after receiving the defendant's written consent that the police searched the room.

We affirm the trial court's holding that, based on the totality of the circumstances, the defendant freely and voluntarily consented to the search of his motel room.

### III.

 The defendant contends that the trial court abused its discretion by denying his motion for sanctions [8] for the prosecution's violation of the sequestration order. We disagree.

During the defendant's trial Detective Stiles testified that when he obtained fingernail scrapings and hair samples from the defendant shortly after his arrest, the defendant appeared as if he had just taken a shower. Stiles testified that he was able to remember the defendant's appearance because of a conversation he had with Officer Allen and the district attorney during a recess called during his testimony. Officer Allen denied talking to Detective Stiles about the defendant's appearance.

The trial court held a hearing on the defendant's motion to impose sanctions on the prosecution for violating the sequestration order. At the hearing the district attorney stated that during the recess he talked to Officer Allen and asked him if he remembered if the defendant's hair was damp when he was arrested. The district attorney stated, however, that he had not told Allen about Stiles's testimony, and that he warned Stiles not to tell Allen about his testimony. The trial court concluded that neither the district attorney nor Stiles told Allen about Stiles's testimony. The record firmly supports the trial court's conclusion that during the recess Allen remained unaware of Stiles's testimony. In fact, no one testified to the contrary.

 "Matters relating to the sequestration of witnesses and violations of sequestration orders traditionally have remained within the trial court's sound discretion." *People v. Wood,* 743 P.2d 422, 429 (Colo.1987); *People v. Gomez,* 632 P.2d 586, 594 (Colo.), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1981); *Peo-*

---

8. In addition to a mistrial, sanctions for violation of a sequestration order fall into three categories: (1) citing the witness for contempt; (2) permitting comment on the witness's noncompliance in order to reflect on his or her credibility; or (3) refusing to let the witness testify or striking his or her testimony. *People v. P.R.G.,* 729 P.2d, 380, 382 (Colo.App.1986) (citing J. Weinstein & M. Berger, *Weinstein's Evidence* § 615[03] (1985)).

*ple v. P.R.G.*, 729 P.2d 380, 382 (Colo.App. 1986). The record supports the trial court's conclusion that Stiles, Allen and the district attorney did not violate the sequestration order by conversing in the hallway during the recess.[9] We cannot conclude that the trial court abused its discretion when it ruled that the prosecution did not violate the sequestration order. *See Hampton v. People*, 171 Colo. 153, 465 P.2d 394 (1970); *People v. Wright*, 678 P.2d 1072 (Colo.App.1984).

## IV.

■ On February 28, 1984, the People moved to amend the information against the defendant to include three counts under subsection 16–13–101(2), 8 C.R.S. (1978), of the Habitual Criminal Act, §§ 16–13–101 to –103, 8 C.R.S. (1978). The added counts alleged that the defendant had been convicted of the felonies of habitually giving a worthless check (in violation of Kan.Stat. Ann. § 21–3708), theft of property valued at over $50 (in violation of Kan.Stat.Ann. § 21–3701), and forgery (in violation of Kan.Stat.Ann. § 21–3710). *See People v. District Court*, 711 P.2d 666 (Colo.1985) (ordering district court to sentence the defendant under subsection 16–13–101(2)). The defendant contends that the trial court's denial of his motion to dismiss the habitual criminal counts was error because the People did not allege or prove that the crimes the defendant committed would have been felonies if they had been committed in the state of Colorado. We disagree.

Subsection 16–13–101(2) provides that:

[e]very person convicted in this state of any felony, who has been three times previously convicted ... either in this state *or elsewhere, of a felony* or, under the laws of any other state, ... of a crime which, if committed within this state, would be a felony, shall be adjudged an habitual criminal....

(Emphasis added). As the court of appeals noted in *People v. Swain*, 43 Colo.App. 343, 345, 607 P.2d 396, 398 (1980), subsection 16–13–101(1), which is nearly identical to subsection 16–13–101(2),

provides for three types of former convictions which may be considered in habitual criminal proceedings: (1) those where the defendant has been previously convicted in Colorado of a felony, (2) those where the defendant has been convicted "elsewhere" of a felony, and (3) those where the defendant has been convicted in any other state of a crime, one not designated a felony in that state, but which would be a felony if committed in Colorado.

Subsection 16–13–103(2), 8A C.R.S. (1986), which was in effect when the trial court ruled, provides that:

An information or indictment seeking the increased penalties authorized by section 16–13–101 shall identify by separate counts each alleged former conviction and shall allege that the defendant on a date and at a place specified was convicted of a specific felony. If any such conviction was had outside this state, the information or indictment shall allege that the offense, if committed in this state, would be a felony.

■ The second sentence of subsection 16–13–103(2) only applies to non-felony crimes committed outside of Colorado which would be felonies in Colorado. If the crime the defendant was convicted of outside of Colorado was a felony in the state in which the defendant was convicted, the People need not allege in the information or the indictment that the crime is a felony in Colorado. As we stated in *People v. Marquez*, 692 P.2d 1089, 1101 n. 18 (Colo. 1984), "it makes no difference for the pur-

---

**9.** In order to show that a trial court's denial of a motion for sanctions for violation of a sequestration order was an abuse of discretion, the defendant must demonstrate that he was prejudiced by the trial court's decision. *Wood*, 743 P.2d at 429. Even if Stiles, Allen, and the district attorney did violate the sequestration order, the defendant has not demonstrated that he was prejudiced by the violation. The jury found the defendant not guilty of murder. *See People v. Salazar*, 715 P.2d 1265, 1271 (Colo.App.1985), *cert. granted*, March 10, 1986, *cert. denied as improvidently granted*, 744 P.2d 80 (Colo.1987). The record does not reflect bad faith behavior on the part of the prosecution. *See Wood*, 743 P.2d at 429.

poses of enhanced punishment that a previously committed crime is not a felony in Colorado if it is a felony where the conviction was had" (citing *People v. Renfrow*, 199 Colo. 101, 103, 605 P.2d 915, 916 (1980)).

We reject for the same reason the defendant's argument that the prosecution was required to prove that the crimes the defendant was convicted of in Kansas would have been felonies in Colorado. It was sufficient for the purposes of subsection 16–13–101(2) and subsection 16–13–103(2) that the crimes the defendant committed were felonies in Kansas. *See Marquez*, 692 P.2d at 1101 n. 18; *Renfrow*, 199 Colo. at 103, 605 P.2d at 916.

### V.

The defendant contends that his conviction on the habitual criminal counts in the amended information is invalid because he did not receive an adequate advisement before pleading guilty to the Kansas felonies. The defendant pleaded guilty in 1973 in district court in Butler County, Kansas, to forgery by check, and the court accepted his plea. In 1982 the defendant pleaded *nolo contendere* to a charge of habitually giving worthless checks. The defendant argues that in both cases his pleas were neither voluntarily nor intelligently made. We disagree.

■ Due process of law requires that a defendant's plea of guilty be knowing and voluntary. *Henderson v. Morgan*, 426 U.S. 637, 644–45, 96 S.Ct. 2253, 2257–58, 49 L.Ed.2d 108 (1976); *Harshfield v. People*, 697 P.2d 391, 393 (Colo.1985). "A plea is neither voluntary nor knowing unless the defendant is advised of the 'true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Harshfield*, 697 P.2d at 393 (quoting *Henderson*, 426 U.S. at 645, 96 S.Ct. at 2257); *see also Marshall v. Lonberger*, 459 U.S. 422, 436, 103 S.Ct. 843, 852, 74 L.Ed.2d 646 (1983). To establish that due process has been satisfied "the record must show affirmatively that the defendant understood the critical elements of the crime to which a plea is tendered."

*Harshfield*, 697 P.2d at 393 (citing *Watkins v. People*, 655 P.2d 834 (Colo.1982) (prior state conviction resulting from a constitutionally defective plea of guilty cannot be used in subsequent criminal proceeding to enhance punishment under habitual criminal statute)); *see also Lacy v. People*, 775 P.2d 1, 4–7 (Colo.), *cert. denied sub nom. Colorado v. Lacy*, —— U.S. ——, 110 S.Ct. 350, 107 L.Ed.2d 337 (1989).

[T]he sufficiency of any particular colloquy between the judge and the defendant as to the nature of the charges will "vary from case to case, depending on the peculiar facts of each situation, looking to both the complexity of the charges and the personal characteristics of the defendant, such as his age, education, intelligence, the alacrity of his responses, and whether he is represented by counsel.

*United States v. Kamer*, 781 F.2d 1380, 1384 (9th Cir.) (quoting *United States v. Wetterlin*, 583 F.2d 346, 351 (7th Cir.1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979)), *cert. denied*, 479 U.S. 819, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986).

■ This court adopted Crim.P. 11 to assure that trial courts would carefully assess a defendant's understanding of the nature of the charges against him when he tenders a plea of guilty. *Harshfield*, 697 P.2d at 393. In *Henderson v. Morgan*, 426 U.S. at 644, 96 S.Ct. at 2257, the Supreme Court tested the voluntariness of a defendant's plea based on the "totality of the circumstances," rather than on an examination of whether the trial court read the defendant "a ritualistic litany of the formal legal elements of [the] offense." *See also Lacy*, 775 P.2d at 5. "Without an affirmative showing of compliance with the mandatory provisions of Crim.P. 11, a plea of guilty cannot be accepted, and any judgment and sentence which is entered following the plea is void." *People v. Randolph*, 175 Colo. 454, 457, 488 P.2d 203, 204 (1971). The validity of a defendant's guilty plea in a foreign jurisdiction is measured against the requirements of due process and that jurisdiction's equivalent of Rule 11. *See Marquez*, 692 P.2d at 1101 (validity of prior guilty plea in federal district court mea-

sured against requirements of Fed.R. Crim.P. 11). When the defendant attacks the validity of a judgment underlying an enhanced penalty under the habitual criminal statute, the respective burdens of proof are somewhat different. "A defendant attacking the constitutionality of a prior conviction in habitual criminal proceedings must make a prima facie showing that the guilty plea was unconstitutionally obtained." *Lacy,* 775 P.2d at 6. "A prima facie showing means evidence that, when considered in a light most favorable to the defendant, will permit the court to conclude that the conviction failed to meet relevant constitutional standards." *Id.* A mere showing of uncertainty about whether the defendant's rights were fully protected is insufficient to support the vacation of an enhanced penalty. *People v. Romero,* 767 P.2d 782, 786 (Colo.App.1988) *(citing People v. Mascarenas,* 632 P.2d 1028 (Colo. 1981)).

■ The defendant first argues that the elements of the 1973 forgery charge to which he pleaded guilty were not readily understandable to a person of ordinary intelligence, and therefore the court's failure to explain the elements to him violated his right to due process and Kan.Stat.Ann. section 22–3210, which is the Kansas equivalent of Crim.P. 11. The defendant was represented by counsel when in 1973 he pleaded guilty to the forgery charge. The judge at the providency hearing read the information to the defendant.[10] "Reading the information to a defendant at a providency hearing is an acceptable method of advising the defendant of the nature of the offense charged if the offense is relatively simple, such as those crimes 'which do not include elements so technical in nature as to be beyond the understanding of persons of normal intelligence.' " *People v. Trujillo,* 731 P.2d 649, 651 (Colo.1986) (quoting *Wilson v. People,* 708 P.2d 792, 796 (Colo. 1985)). After reading the information, the judge asked the defendant if he understood the charge against him and the defendant replied that he did. The judge also asked the defendant to explain in his own words what he did to precipitate the charge against him. The defendant answered that he wrote the check with the intention of paying it back the following Thursday. The defendant also admitted, however, that he signed the check with the name "Robert J. McCalla" without Mr. McCalla's authority.

The contents of the information were sufficient to advise the defendant of the elements of the crime of forgery by check. *See Noble v. State,* 240 Kan. 162, 169–170, 727 P.2d 473, 480 (1986); *see also Trujillo,* 731 P.2d at 651 ("[t]he word 'feloniously' in an information is equivalent to 'knowingly,' and sufficiently apprises the defendant of that element of the crime when read at a providency hearing"). The fact that the defendant stated that he intended to repay the check does not establish that the defendant did not understand the charge. The record demonstrates that the defendant wrote the check under another person's name without that person's permission, and that he understood that his actions were a violation of Kansas law. *See Noble,* 240 Kan. 162, 727 P.2d 473; *Trotter v. State,* 218 Kan. 266, 269–270, 543 P.2d 1023, 1027 (1975); *see also People v. Hrapski,* 718 P.2d 1050, 1056 (Colo.1986).

■ The defendant also contends that his plea of *nolo contendere* in 1982 to the charge of habitually giving worthless checks was not voluntarily and intelligently made. To commit the crime of habitually giving worthless checks, an individual must "feloniously" give a worthless check in violation of Kan.Stat.Ann. § 21–3707 (1988). To "give a worthless check" an individual must make a check with an intent to defraud and with the knowledge that the account on which the check is drawn has insufficient funds to cover the check. Kan.

---

**10.** The judge repeated the charge in the information as follows:

That in Butler County, Kansas on the 18th day of June, 1973, JAMES A. DRAKE did knowingly, wilfully, feloniously and with intent to defraud, make or draw a written instrument to wit: a check for $22.50 in such a manner that it purported to have been made by the authority of Robert J. McCalla who did not give such authority (K.S.A. 21–3710; K.S.A. 21–4501).

Stat.Ann. § 21–3707 (1988). The defendant argues that because the trial·court did not explain the elements of "giving a worthless check" his plea of *nolo contendere* to the charge of habitually giving worthless checks was not voluntary and intelligent. The defendant also argues that his plea was invalid because the court did not advise him of the applicable sentence, erroneously advised him that a plea of *nolo contendere* does not by itself suffice for a conviction, and failed to advise him that he could subpoena out-of-state witnesses at the state's expense.

The defendant appeared before the Kansas district court on August 27, 1982, on the charge of habitually giving worthless checks, and the trial judge read the complaint to him.[11] The defendant requested court-appointed counsel and on August 30th the court appointed an attorney to represent the defendant. On September 2, 1982, the defendant appeared with counsel and the court held a preliminary hearing. After the preliminary hearing the defendant was bound over for trial and arraigned upon the complaint. The defendant entered a plea of not guilty.

On September 20, 1982, the defendant appeared with counsel before a different judge to change his plea to guilty. At the September 20th appearance the defendant stated that he remembered being advised by the trial court of his rights with regard to pleading guilty, not guilty, or no contest. The defendant also stated that he understood that he had an absolute right to plead not guilty and go to trial. The court then asked the defendant if in July of 1981 he wrote five checks totaling more than fifty dollars knowing he did not have sufficient funds to pay the checks, and the defendant answered that he did.

The trial court then asked the defendant the following:

THE COURT: Mr. Drake[,] has anyone made any threats in order to force you to plead guilty?

DEFENDANT: No[,] sir.

THE COURT: Has anyone promised you that anything good would happen if you did?

DEFENDANT: No[,] sir.

THE COURT: Are you pleading guilty because you committed the crime?

DEFENDANT: Yes[,] sir.

THE COURT: Are you doing so voluntarily?

DEFENDANT: Yes[,] sir.

THE COURT: After discussing the matter with [your attorney]?

DEFENDANT: Yes[,] sir.

The trial ·court then found the defendant guilty of the crime of habitually giving worthless checks and found that the defendant's plea was voluntarily and intelligently entered. The trial court then set the defendant's sentencing for October 15, 1982.

On October 15, 1982, the defendant appeared for sentencing before the same judge that held the hearing on September 20th. At that time the trial court noted that the defendant made conflicting statements during his pre-sentence investigation, some of which indicated that he did not commit the crime. The court stated that it did not "want to sentence anybody for a crime they didn't commit." Defense counsel then asked to put the defendant on

11. The complaint stated that:

Joseph L. McCarville, III[,] who complains and states that on or about the 20th day of July, 1981, in said County of Reno and State of Kansas, one James Drake then and there being, did then and there, unlawfully FELONIOUSLY and willfully ... make, draw, issue or deliver two (2) or more worthless checks as defined by K.S.A. 21–3707, with the intent to defraud and knowing at the time of the making, drawing, issuing or delivering of each check, order or draft that the maker or drawer has no deposits in or credit with such banks or depository or has not sufficient funds in or credits with such bank or depository for the payment of each check, order or draft in full upon its presentation, where each of the said worthless checks is drawn in the amount of less than fifty dollars ($50.00), to-wit: five (5) checks given to the Half Circle Inn in the amounts of $20.00, $40.00, $29.00, $25.00 and $40.00 and where the total amount for such worthless checks drawn is fifty dollars ($50.00) or more and each of the checks was given on the same day, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Kansas.

the stand to explain his reasons for pleading guilty. The defendant took the stand and answered questions from his lawyer about his plea of guilty and his statements to the official conducting the pre-sentence investigation. In response to his counsel's request for an explanation the defendant gave confusing answers and stated several times that he pleaded guilty to avoid the possibility of receiving a harsh sentence if he were found guilty after a trial. The court then asked several questions of the defendant, whereupon defendant's counsel asked to confer with his client. After conferring with his client in private defendant's counsel announced that the defendant intended to withdraw his plea of guilty and enter a plea of *nolo contendere.* The court then explained to the defendant that by pleading *nolo contendere* he was waiving his right to a trial and an appeal. The court also explained that at a trial the State would have to prove the defendant's guilt beyond a reasonable doubt. The defendant indicated he understood his rights and entered a plea of *nolo contendere.* The court then engaged the defendant in a colloquy which established the voluntariness of the defendant's plea.

We reject the defendant's argument that his plea was not voluntarily and intelligently made because the trial court did not explain the elements of habitually giving worthless checks. The trial court read the charge to the defendant at his August 27th appearance. *Trujillo,* 731 P.2d at 651. On August 30, 1982, the trial court appointed an attorney for the defendant who represented the defendant throughout the proceedings. The defendant also conferred with counsel at the providency hearing before entering his plea of nolo contendere. *Henderson,* 426 U.S. at 647, 96 S.Ct. at 2257; *State v. Browning,* 245 Kan. 26, 33–34, 774 P.2d 935, 940 (1989); *Noble,* 240 Kan. at 165–66, 727 P.2d at 476–77. In *Henderson,* 426 U.S. at 647, 96 S.Ct. at 2258, the United States Supreme Court held that "it may be appropriate to pre-

sume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *See also Oppel v. Meachum,* 851 F.2d 34, 38 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 266, 102 L.Ed.2d 254 (1988). The Supreme Court held in *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), that "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, . . . [h]e may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not 'within the range of competence demanded of attorneys in criminal cases' " (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). *See Hill v. Lockhart,* 474 U.S. 52, 56–7, 106 S.Ct. 366, 369–70, 88 L.Ed.2d 203 (1985). In *Tollett,* 411 U.S. at 268, 93 S.Ct. at 1608, the Court held that to obtain habeas corpus relief respondent had to not only establish the unconstitutional discrimination in the selection of his grand jury, but also that his attorney's advice to plead guilty without having made inquiry into the composition of the grand jury rendered that advice outside the range of competence demanded of attorneys in criminal cases. In this case the defendant has made no showing that his counsel failed to advise him of the elements of habitually giving worthless checks, or that, in the absence of such advice, he did not understand the charge. The defendant's admissions to the court of the acts he committed demonstrated his knowledge of the elements of habitually giving worthless checks.

Although the court did not advise the defendant of the applicable sentence for habitually giving worthless checks, the defendant was represented by counsel, and the record establishes that his counsel explained the applicable sentence to him.[12]

---

**12.** The record of the providency hearing establishes that the defendant's attorney advised him that, if he were convicted after a trial, the state would seek to enhance the sentence by relying

on Kansas habitual offender statutes, and that the defendant pleaded *nolo contendere* to avoid this possibility.

See Browning, 245 Kan. at 33–34, 774 P.2d at 940.

The defendant argues that the trial court erroneously advised him that the court's acceptance of a plea of nolo contendere does not automatically create a conviction. The record of the providency hearing demonstrates that the trial court advised the defendant that if he pleaded nolo contendere the court would decide his guilt based on the district attorney's offer of proof. The court also stated that "[t]he chances are ninety-nine point nine percent that you would be found guilty, do you understand that?" The defendant answered that he did. The court also confirmed that the defendant was pleading nolo contendere after discussing his plea with his attorney. The trial court's advisement at the providency hearing was entirely consistent with Kansas law. According to Kan.Stat.Ann., subsection 22–3209(2) (1988), "[a] plea of nolo contendere is a formal declaration that the defendant does not contest the charge. When a plea of nolo contendere is accepted by the court, a finding of guilty may be adjudged thereon." "Once a plea of nolo contendere has been accepted by the court and a finding of guilty has been entered thereon, the accused stands convicted of the offense." State v. Fisher, 233 Kan. 29, 34, 661 P.2d 791, 796 (1983); see also State v. Holmes, 222 Kan. 212, 214, 563 P.2d 480, 482 (1977).

Finally, we reject the defendant's claim that the trial court's advisement did not satisfy the requirements of due process because the trial court failed to advise the defendant that he could subpoena out-of-state witnesses at the state's expense. Due process of law does not require that a court inform a defendant of every conceivable constitutional right that might be waived by a guilty or nolo contendere plea. Carried to its logical extreme, this argument would require a court, before accepting a guilty or nolo contendere plea, to inform a defendant, among other things, of his right to be free from cruel and unusual punishment, his right to be free from unreasonable searches and seizures, his right to be pro-

tected against being placed twice in jeopardy for the same crime, and his right to reasonable bail. See Tollett, 411 U.S. at 267–68, 93 S.Ct. at 1608–09; United States v. Frontero, 452 F.2d 406, 415 (5th Cir. 1971). The defendant knew what a trial by jury entailed, having previously been tried by a jury in 1978 on the charge of theft.

The record of the hearing indicates that the defendant pleaded guilty to avoid the heavier sentence that the prosecution would have requested had the case gone to trial. The trial court carefully explained to the defendant that the prosecution would have to prove that he wrote the bad checks. The defendant replied that he understood that, but that he felt he would be convicted if the case went to trial. After conferring with his lawyer the defendant withdrew his plea of guilty and entered a plea of nolo contendere. The trial judge accepted the plea, listened to the state's offer of proof, and found the defendant guilty. The court then granted the defendant's request for a lenient sentence that would allow him to leave Kansas, and sentenced the defendant to three years probation. The record supports the trial court's ruling that the Kansas trial court's advisement did not violate the defendant's right to due process.

### VI.

The defendant argues that his 1978 conviction for theft was the result of ineffective assistance of counsel, and that during his trial he was denied his right to confront adverse witnesses, in violation of both the United States and Colorado Constitutions. In 1978 the defendant and his previous wife Frankie were both charged with theft and received a joint trial. Both the defendant and Frankie were represented by the same lawyer. The defendant specifically argues that he was prejudiced by his counsel's action of submitting a motion for acquittal on Frankie's behalf but not on his behalf, and by his counsel's failure to object to a prosecution witness's hearsay statement. We hold that the defendant's 1978 trial violated neither his right to effective assistance of counsel nor his right to confront adverse witnesses.

■ To demonstrate that counsel's assistance was so defective as to require reversal of a conviction, a defendant must demonstrate that "defense counsel's performance at trial was below the level of reasonably competent assistance to which an accused is constitutionally entitled." *People v. Norman,* 703 P.2d 1261, 1272 (Colo.1985). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The defendant must also "show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068.

■ The defendant's counsel's joint representation of the defendant and Frankie did not deprive the defendant of his sixth amendment right to effective assistance of counsel. "A defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *People v. Castro,* 657 P.2d 932, 943 (Colo.1983). The defendant's counsel's decision to move for an acquittal for Frankie but not for the defendant does not demonstrate an actual conflict of interest which adversely affected the defendant's lawyer's performance. The defendant was not prejudiced by his counsel's decision to only submit a motion for acquittal on behalf of Frankie because the trial court denied the motion. The defendant only argues that had the motion been granted he might have been prejudiced because the jury might have inferred that Frankie's acquittal demonstrated the defendant's guilt. The defendant's argument admits that he was not actually prejudiced by his counsel's actions. *Cf. Armstrong v. People,* 701 P.2d 17, 22–23 (Colo. 1985) (conflict existed where attorney represented co-defendants who engaged in "greatly divergent criminal conduct"); *Castro,* 657 P.2d at 944–45 (actual conflict where attorney represented district attorney in litigation challenging district attorney's recall and in prosecution of district attorney for overspending, at same time attorney represented defendant). The defendant has not shown that his counsel's performance was "below the level of reasonably competent assistance," *Norman,* 703 P.2d at 1272, or that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Therefore his right to effective assistance of counsel was not infringed.

■ We also reject the defendant's argument that his counsel's failure to object to the prosecution witness's hearsay testimony deprived him of effective assistance of counsel. The defendant's and Frankie's defense to the theft charge was that they believed their employer would cover their withdrawals with sufficient deposits of his own. Therefore the defendant's argument that he was deprived of effective assistance of counsel because his lawyer was unable to cross-examine Frankie or impeach her story is without merit.

VII.

■ The defendant argues that we must vacate his life sentence because the

trial court promised him that if he submitted an instruction on the lesser non-included offense of accessory, the trial court would not sentence him to life imprisonment under the Habitual Criminal Act. We disagree.

During his trial the defendant asked for a ruling from the court on the validity of the habitual criminal counts in order to assess whether to offer an instruction on the lesser non-included offense of accessory. The defendant and the People then argued over whether a court can impose an enhanced sentence under the Habitual Criminal Act when the defendant is convicted of a lesser non-included offense not contained in the information. The defendant argued that unless he received a definitive ruling from the court the possibility that he would receive a life sentence as an habitual offender if he were convicted of acting as an accessory would chill his exercise of his right to ask for an instruction on the lesser non-included offense. The following colloquy took place between the trial court and David Eisner, the public defender representing the defendant:

[MR. EISNER:] My concern is that I am not going to know whether we are facing life or four to eight on a class four felony, unless you give us the green light right now.

THE COURT: What you are saying, I think, is something that I am not really in power to give.

You are asking me for a decision out of a question that is ultimately going to be decided by the appellate courts, and hopefully, by the Colorado Supreme Court, and it is a close question, and I don't know which way they are going to decide, and I don't have any real clear guidance on it.

I tend to agree with you, but I am not going to preclude the government from establishing the fact or preserving any error because we can't reassemble this.

MR. EISNER: Judge, are you telling me then if they come back with a lesser not included that he gets a life sentence?

THE COURT: Not from me. Not from me.

In response to Mr. Eisner's expression of concern that the court could not definitively state whether the habitual criminal counts applied to the lesser non-included offense, the court stated:

The definitive answer, once again, Mr. Eisner, is this. I will rule if the habitual criminal counts do not apply to a lesser non-included offense should there be a guilty verdict of that; however, as an adjunct to that ruling, I will allow the government to establish the existence of those prior convictions before this jury in a bifurcated proceeding because they will never hereinafter have the opportunity to do so again as the statute is written.

In *Apodaca v. People*, 712 P.2d 467, 473 (Colo.1985), we noted that "[a] timely judicial ruling on a defendant's motion to suppress prior conviction evidence for the purposes of impeachment serves the vital function of providing the defendant with the meaningful opportunity to make the type of informed decision contemplated by the fundamental nature of the right to testify in one's own defense." We held in that case that the trial court's failure to timely rule on the defendant's suppression motion impermissibly burdened the defendant's exercise of his constitutional right to testify in his own behalf. *Id.*

In this case the trial court did not impermissibly burden the defendant's exercise of his right to tender a lesser non-included defense instruction because the trial court addressed the defendant's request for a ruling in a timely manner. The trial court informed the defendant that it would not impose a life sentence on him if he were convicted of only the lesser non-included offense. The trial court also informed the defendant, however, that the issue whether the Habitual Criminal Act applied to lesser non-included offenses had not been decided by Colorado's appellate courts, and the court could not predict how the appellate courts, including this court, would resolve the issue. In *People v. District Court*, 711 P.2d 666, 668–69 (Colo.1985), we held that James Drake's conviction on the lesser non-included offense of accessory subjected him to an enhanced sentence under the

Habitual Criminal Act. We noted that it was the defendant "who requested the instruction on accessory to murder in the first degree and the accompanying verdict form for that lesser non-included offense.... When such a request was granted ... the defendant thereby acquiesced in placing a lesser non-included felony before the jury and stood in the same position as if that offense had originally been included in the charging document." *Id.* at 671. At the time we decided *District Court* the issue of whether trial courts may impose enhanced sentences under the Habitual Criminal Act for convictions on lesser non-included offenses was one of first impression. Given the unsettled nature of the law at the time, the trial court fulfilled its constitutional responsibilities to the defendant by advising him of the ruling it would make but warning him that the ruling might be overturned on appeal.

### VIII.

■ Finally, we reject the defendant's argument that the life sentence imposed by the trial court under the Habitual Criminal Act violates the eighth amendment prohibition against cruel and unusual punishment. In *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983), the United States Supreme Court held that "a criminal sentence must be proportionate to the crime for which the efendant has been convicted." The Court also held that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 292, 103 S.Ct. at 3011.

In this case the defendant's conviction of accessory to first degree murder subjected him to the Habitual Criminal Act. In *People v. Hernandez,* 686 P.2d 1325, 1330

(Colo.1984), we upheld the imposition of a life sentence under the Habitual Criminal Act where the defendant was convicted of second degree burglary and conspiracy to commit second degree burglary. We consider the crime of accessory to first degree murder to be more serious than the crime of second degree burglary. The defendant is also eligible for parole under subsection 17–2–207(2), 8 C.R.S. (1978 & 1983 Supp.), after he has served twenty years of his life sentence under subsection 16–13–101(2).[13] *See Hernandez,* 686 P.2d at 1330. The availability of parole for the defendant is a factor in our proportionality analysis because it could reduce the defendant's actual period of confinement to twenty years. *See Hernandez,* 686 P.2d at 1330 n. 4 (suggesting that constitutionality of habitual criminal statute depends to great extent on availability of parole).

In view of the gravity of the offense of accessory to first degree murder, and the length of the defendant's parole-eligible sentence compared to sentences imposed on other defendants in this and other jurisdictions, the trial court's imposition of a life sentence under the Habitual Criminal Act did not violate the eighth amendment prohibition of cruel and unusual punishment. *See United States v. Gourley,* 835 F.2d 249, 252–53 (10th Cir.1987).

Affirmed.

LOHR, J., concurs in part and dissents in part.

KIRSHBAUM, J., joins in the concurrence and dissent.

Justice LOHR concurring in part and dissenting in part:

I agree with the majority that the trial court committed no reversible error in denying defendant James Alvey Drake's (the defendant's) motions to suppress and motion for sanctions against the prosecutor. I agree as well that the 1973 and 1978 Kansas offenses that were used to support the defendant's conviction on two habitual

---

**13.** Subsection 17–2–207(2) was repealed on April 13, 1984. 1984 Colo.Sess.Laws 524. The defendant is eligible for parole under the sub-

section because it was in effect when he committed the crime of accessory.

criminal counts were constitutionally valid. I disagree, however, with the majority's determination that the defendant's prior plea of guilty to the 1982 Kansas offense, which provides the predicate for one of the three habitual criminal counts of which he was convicted, met constitutional standards. Because I conclude that the defendant's prior 1982 conviction was constitutionally infirm, I would vacate the defendant's increased sentence under section 16–13–101(2) of the Habitual Criminal Act, §§ 16–13–101 to –103, 8 C.R.S. (1978), and would remand for resentencing under section 16–13–101(1). Accordingly, I respectfully dissent.

## I.

In *Lacy v. People*, 775 P.2d 1 (Colo.1989), *cert. denied sub nom. Colorado v. Lacy*, —— U.S. ——, 110 S.Ct. 350, 107 L.Ed.2d 337 (1989), this court held that two prior convictions were constitutionally infirm where the defendant had not been adequately advised of critical elements of the charges against him before entering pleas of guilty, and therefore the two prior convictions could not be used to support habitual criminal charges against the defendant. As we pointed out in *Lacy*, under *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), due process demands that a defendant receive "real notice of the true nature of the charge against him." *Lacy*, 775 P.2d at 4 (quoting *Henderson*, 426 U.S. at 645, 96 S.Ct. at 2257). Although a trial court need not follow a set ritual in giving advisements, *see, e.g., People v. Wade*, 708 P.2d 1366, 1368 (Colo.1985), the record in a providency proceeding as a whole must affirmatively demonstrate that the defendant entered his guilty plea voluntarily and understandingly. *See id.; Harshfield v. People*, 697 P.2d 391, 393 (Colo.1985). To satisfy constitutional requirements, the trial court should explain the critical elements of the offense charged in terms that are understandable to the defendant. *Watkins v. People*, 655 P.2d 834, 837 (Colo.1982). Where the crime to which the plea is entered is relatively simple, reading the information to the defendant is an acceptable method of advising him of the nature of the offense charged. *See, e.g., People v. Trujillo*, 731 P.2d 649, 651 (Colo.1986); *Wilson v. People*, 708 P.2d 792, 797 (Colo.1985). Regardless of the complexity of the crime, however, the record must demonstrate that the defendant understood any mental state element of the crime to which he pled guilty. *Lacy*, 775 P.2d at 6; *see also Harshfield*, 697 P.2d at 394–95.

A defendant attacking the constitutionality of a prior conviction in habitual criminal proceedings must make a prima facie showing that the guilty plea was unconstitutionally obtained. *Wade*, 708 P.2d at 1368. In Colorado, pleas of guilty and *nolo contendere* must comply with Crim.P. 11 before they may be accepted by the trial court. In evaluating the validity of the 1982 Kansas plea at issue here, however, we need consider only constitutional standards and need not address the validity of the plea under the statutory and case law of Kansas. *See Lacy*, 775 P.2d at 4 n. 4; *People v. Meyers*, 617 P.2d 808, 814–15 (Colo.1980).

## II.

In 1982, the defendant entered a plea of *nolo contendere* in a Kansas district court to the charge of habitually giving worthless checks. The defendant initially entered a plea of not guilty, later changed his plea to guilty, and finally changed his plea to *nolo contendere* at the sentencing hearing on his guilty plea.

The offense to which the defendant pleaded was defined by the statutes of the State of Kansas as follows:

Habitually giving worthless checks is:

. . . .

(b) Giving two (2) or more worthless checks, as defined by section 21–3707, each drawn for less than fifty dollars ($50), where the total amount for which such worthless checks are drawn is fifty dollars ($50) or more and each of such checks was given on the same day.

Kan.Stat.Ann. § 21–3708.

Giving a worthless check is the making, drawing, issuing or delivering or causing or directing the making, drawing, issuing

or delivering of any check, order or draft on any bank, credit union, savings and loan association or depository for the payment of money or its equivalent *with intent to defraud* and knowing, at the time of the making, drawing, issuing or delivering of such check, order or draft, that the maker or drawer has no deposit in or credits with the drawee or has not sufficient funds in, or credits with, the drawee for the payment of such check, order or draft in full upon its presentation.

Kan.Stat.Ann. § 21–3707(1) (emphasis added).

"Intent to defraud" means an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property.

Kan.Stat.Ann. § 21–3110(9).

On September 20, 1982, the defendant appeared with counsel in district court in Reno County, Kansas, and asked to change his initial not guilty plea of September 2, 1982, to guilty. The court asked the defendant if he remembered having appeared on September 2 before a different judge, and the defendant said that he did. The court then asked, "[d]o you recall [the judge] reading your rights to you with regard to pleading guilty, not guilty or no contest?" The defendant agreed that he did and acknowledged that at that appearance he entered a plea of not guilty. The court advised the defendant that he could plead not guilty, guilty or no contest and asked him how he wished to plead. The defendant replied, "guilty, sir." The court and the defendant then engaged in the following colloquy:

THE COURT: Did you on the 20th day of July, 1981, deliver five checks to the Half Circle Inn, the total of such checks was more than Fifty Dollars?

DEFENDANT: Yes sir.

THE COURT: At the time did you know that you did not have sufficient funds in the bank to pay those checks?

DEFENDANT: Yes.

THE COURT: Is the Half Circle Inn in Reno County?

DEFENDANT: Yes sir.

The court then accepted the plea of guilty. At no point in the proceedings was the defendant advised of the elements of the crime to which he was offering his plea, either by a reading of the charge or in any other manner. Nor was any mention made of the possible penalties for conviction.

On October 15, 1982, the defendant appeared once more before the Kansas court with counsel for further proceedings. The court expressed concern that a presentence report contained statements made by the defendant that he did not commit the crime and also expressed an unwillingness to sentence the defendant under such circumstances. The defendant then testified. Although his testimony was somewhat confusing, he clearly told the court that he did not write the checks upon which the charge was based and that he was not even in the state of Kansas at the time they were written. He stated, however, that the only way he could prove his absence at that time was to bring witnesses from Louisiana "and I can't afford that and I, all I want[ ] to do is go ahead and plead guilty." He also expressed concern that if he went to trial he "would be facing Nine to Thirty and I [don't] want that." His attorney then offered the explanation that in plea negotiations a prosecuting attorney advised the defendant that if he were found guilty the prosecutor "would request the institution of the habitual criminal act for sentencing." The court then asked the defendant to decide how to plead, to which he replied that he wanted to keep his plea of guilty and get it over with. However, when the court again told the defendant he could withdraw his plea and asked if he wished to do so, his attorney requested and received permission to confer with the defendant before he made his decision.

After the conference the attorney told the court that the defendant wished to plead no contest. The court then allowed the defendant to withdraw his plea of guilty and told the defendant of his pleading options. The defendant pleaded no con-

test. The court then sought assurance that the defendant understood the significance of a no contest plea, stating:

> THE COURT: A plea of no contest means that you would simply, you don't admit the crime but you do not deny it, therefore I would simply ask [the prosecutor] what the facts would show and based solely upon what he tells me I would decide whether you are guilty. If you violently disagree with what he has to say you don't get an opportunity to say so, you must stand there silently and listen to him.
>
> A: Yes sir.
>
> THE COURT: The chances are ninety-nine point nine percent that you would be found guilty, do you understand that?
>
> A: Yes sir.
>
> THE COURT: So, has anyone made any threats to you in order to force you to plead no contest?
>
> A: No sir.
>
> THE COURT: Has anyone promised you anything good would happen if you did?
>
> A: No sir.
>
> THE COURT: Are you doing so voluntarily?
>
> A: Yes sir.
>
> THE COURT: And are you doing so after discussing the matter with [your attorney]?
>
> A: Yes sir.

The court then asked the prosecutor to state what the evidence would show. The prosecutor replied:

> The evidence would be, your Honor, that ... Wanda Cape, the owner of the Half Circle Inn [received] checks purportedly written by James Drake and given to the Half Circle Inn in South Hutchinson, Reno County, Kansas, dated July 20th, 1981, in the amounts of $20.00; $40.00; $29.00; $25.00 and $40.00. And ... checks ... dated the 21st of July, 1981, issued to the same tavern at the same location in the amounts of $40.00; $25.00; $50.00 and $40.00. Wanda Cape would testify that she' could personally identify the defendant, James Drake as the person who passed those checks ... and that none of them were preexisting debts ... and all the checks were dishonored both times for the reason that there was insufficient funds in the account to pay the checks....

Without further inquiry of the defendant, the court found the plea to have been voluntarily and intelligently entered, found the defendant guilty of habitually issuing worthless checks, and proceeded immediately to sentencing.

At no point in the proceedings on September 20 or October 15 was the defendant advised of the elements of the offense or the possible penalties for conviction. The majority relies on the September 20 hearing to establish an advisement of the elements of the offense. There was nothing in the colloquy between the court and the defendant on that date, however, that would inform the defendant that the court's questions were intended to cover a comprehensive list of the elements of the crime with which he was charged. In fact, they did not, for one element of the habitually giving worthless checks charge is specific intent to defraud and another is that each of the checks involved must be for an amount less than fifty dollars. The defendant was not informed at either of the providency hearings that the specific intent to defraud is an element of the offense.[1] *See Harshfield*, 697 P.2d at 395 ("The basic distinction between crimes involving intent and crimes requiring only a voluntary act cannot be dismissed as incon-

---

1. To support its conclusion that the defendant understood the elements of the charge, the majority relies in part upon the fact that the court read the charge to ·the defendant at his first appearance, without counsel, on August 27, 1972, a month and a half and a number of court appearances before the October 15, 1982, providency hearing at which his plea of *nolo contendere* was offered and accepted. I can discover no basis in logic or in precedent to support a conclusion that this evidences the defendant's understanding of the elements of the charge when he offered his plea. *Trujillo*, 731 P.2d at 651, cited by the majority in this connection, was a case in which we held that a defendant had been adequately advised of the critical elements of a relatively simple and understandable charge by the reading of the information *at the providency hearing*.

sequential in assessing whether a plea of guilty was entered knowingly.").[2]

The majority states that "[t]he defendant's admissions to the court of the acts he committed demonstrated his knowledge of the elements of habitually giving worthless checks." Maj. op. at 1271. This simply does not follow. A defendant's admission to committing a certain act, even where his description of the act amounts to an admission of some or all of the requisite elements, does not imply a recognition on the defendant's part that were he not to plead guilty, the prosecution would have to establish each of those elements beyond a reasonable doubt. Also, as noted above, the court's questions did not include the element of specific intent to defraud. "[A]n inquiry by the court into whether the defendant understands the nature of charges against him is of utmost importance in connection with charges requiring proof of specific intent." *Lacy*, 775 P.2d at 6. On October 15, the date the *nolo contendere* plea was offered and accepted, the court did not advise the defendant of the elements of the offense in any way even though the defendant denied committing the crime.

Moreover, the court never advised the defendant of the possible penalties for the

offense to which he was pleading.[3] This court has frequently held that the voluntariness of a guilty plea turns in part upon whether the defendant understood the consequences of entering such a plea. *See, e.g., People v. Hrapski*, 718 P.2d 1050, 1055–56 (Colo.1986); *Wade*, 708 P.2d at 1368. The Colorado Court of Appeals has ruled that a guilty plea was involuntary under Crim.P. 11, and therefore could not serve as a basis for enhanced punishment under Colorado's habitual criminal offender statute, where the defendant was not fully apprised of the potential penalties for the offense. *See People v. Sutka*, 713 P.2d 1326 (Colo.App.1985), *cert. denied* (Colo. Feb. 24, 1986).

The majority rejects as well the defendant's claim that he should have been advised that he could subpoena out-of-state witnesses at the state's expense, holding that due process does not require a court to inform the defendant of every conceivable constitutional right that might be waived by a guilty or *nolo contendere* plea. *See* maj. op. at 35. While that may be true, this particular right had special application in this case, for the defendant stated to the court that to prove his innocence it would be necessary to bring witnesses to Kansas

---

2. The majority relies heavily on the fact that the defendant was represented by counsel. The majority appears to indulge a presumption that counsel explained the charge to the defendant and then states that "the defendant has made no showing that his counsel failed to advise him of the elements of habitually giving worthless checks, or that, in the absence of such advice, he did not understand the charge." Maj. op. at 1271. This turns the proper burden on its head. The defendant must make a prima facie case that the plea was unconstitutionally obtained. *Lacy*, 775 P.2d at 6. That burden is satisfied when the defendant shows that the record as a whole does not affirmatively demonstrate that he understood the critical elements of the crime to which his plea was tendered. *Id.* at 4. We have never held that the fact that a defendant was represented by counsel is an adequate surrogate for an affirmative demonstration based on matters appearing in the record that the defendant understood the critical elements of the crime. To do so would contravene the standards established in a long line of our cases. *See, e.g., Watkins v. People*, 655 P.2d 834, 837 (Colo.1982) ("Even where the record shows defense counsel has given some explanation to his

client of the count to which the plea of guilty is tendered, we have held that this showing by itself does not constitute the type of demonstration sufficient to justify the conclusion that the defendant knew the critical elements of the charge when the plea of guilty was entered."); *People v. Mason, Jr.*, 176 Colo. 544, 545–46, 491 P.2d 1383, 1383–84 (1971) (defense counsel's explanation to the defendant of charge against him held insufficient to satisfy the constitutional requirement that a defendant understand the nature and elements of the charge before entering plea; guilty plea vacated).

3. The majority states that "the record establishes that [the defendant's] counsel explained the applicable sentence to him." Maj. op. at 1271. In support of that assertion, the majority notes that "[t]he record of the providency hearing establishes that the defendant's attorney advised him that, if he were convicted after a trial, the state would seek to enhance the sentence by relying on Kansas habitual offender statutes...." Maj. op. at 1271 n. 12. This is the only advice about the applicable sentence that appears in the record.

from Louisiana and that he could not afford to do so. Under these circumstances, in order to assure that the defendant's plea was voluntary, the court should have advised him specifically of his ability to subpoena such witnesses at state expense.

I conclude that the defendant presented a prima facie case that the 1982 Kansas conviction was constitutionally invalid. The prosecution did not rebut that case. For that reason, I would remand the case to the trial court for resentencing under section 16–13–101(1). Accordingly, I concur in part with the majority's opinion but dissent to its holding that the 1982 Kansas conviction was constitutionally valid.

KIRSHBAUM, J., joins in this concurrence and dissent.

